*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA and THE COMMISSIONER OF THE DEPARTMENT OF HEALTH & SOCIAL SERVICES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Appellants, | |
| v. | |
| PLANNED PARENTHOOD OF THE GREAT NORTHWEST, | |
| Appellee. | |

Supreme Court No. S-16123

Superior Court No. 3AN-14-04711 CI

O P I N I O N

No. 7334 – February 15, 2019

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances: Stuart W. Goering and Margaret Paton Walsh, Assistant Attorneys General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellants. Susan Orlansky, Reeves Amodio LLC, Anchorage, Janet Crepps, Center for Reproductive Rights, Simpsonville, South Carolina, Autumn Katz, Center for Reproductive Rights, New York, New York, and Laura F. Einstein, Planned Parenthood of the Great Northwest, Seattle, Washington, for Appellee. Kevin G. Clarkson, Brena, Bell, & Clarkson, P.C., Anchorage, Steven H. Aden, Alliance Defending Freedom, Washington, D.C., for Amicus Curiae Alaska Physicians for Medical Integrity. Jeffrey M. Feldman, Summit Law Group PLLC, Seattle, Washington, and Sara L. Ainsworth, Legal Voice, Seattle, Washington, for Amicus Curiae Legal Voice. James J. Davis, Jr., Northern Justice Project, LLC, Anchorage, and Catherine A. McKee, National Health Law

Program, Carrboro, North Carolina, for Amici Curiae Northern Justice Project, LLC and The National Health Law Program.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.
STOWERS, Chief Justice, dissenting.

# I.    INTRODUCTION

We are again called upon to determine whether restrictions placed upon Alaska's Medicaid funding of abortions violate the Alaska Constitution. A 2014 statute and 2013 regulation re-define which abortions qualify as "medically necessary" for the purposes of Medicaid funding. The statute defines medically necessary abortions as those that "must be performed to avoid a threat of serious risk to the life or physical health of a woman from continuation of the woman's pregnancy" as a result of a number of listed medical conditions; the regulation is similarly restrictive. Planned Parenthood of the Great Northwest challenged both the statute and regulation as unconstitutional, and the superior court held that both measures violated the equal protection clause of the Alaska Constitution. The court reasoned that these measures imposed a "high-risk, high-hazard" standard on abortion funding unique among Medicaid services, and held that our 2001 decision striking down an earlier abortion funding restriction on equal protection grounds compelled the same result. The State appeals, arguing that the statute and regulation should be interpreted more leniently and therefore do not violate the Alaska Constitution's equal protection clause.

We affirm the superior court's decision. These measures cannot be interpreted as leniently as the State suggests, and their language compels a "high-risk, high-hazard" interpretation akin to that adopted by the superior court. This standard

imposes different requirements for Medicaid funding eligibility upon women who choose to have abortions than it does upon women who choose to carry their pregnancies to term. The statute's and the regulation's facially different treatment of pregnant women based upon their exercise of reproductive choice requires us to apply strict scrutiny, and the proposed justifications for the funding restrictions do not withstand such exacting examination. We therefore conclude that the statute and the regulation violate the Alaska Constitution's guarantee of equal protection.

## II.    FACTS AND PROCEEDINGS

### A.    Medicaid Coverage In Alaska

Medicaid is a health insurance program for low-income individuals.[1] It was created by the federal government,[2] which sets guidelines for eligibility and requires that certain benefits be provided.[3] The federal government provides matching funds that subsidize states' costs in providing such health care.[4] Individual states administer the program in compliance with federal requirements.[5] But each state decides whether to

---

[1]    AS 47.07.010. Medicaid also provides coverage for certain other individuals. AS 47.07.020 (Medicaid eligible persons).

[2]    *See* Social Security Act, Pub. L. 89-97, 79 Stat. 286 (1965); 42 U.S.C. § 1396-1 (2012).

[3]    *See* 42 U.S.C. § 1396a (describing requirements for state plans for medical assistance); *id.* § 1396-1.

[4]    *Id.* § 1396-1.

[5]    *Id.* (providing for appropriations for payments to states that have received federal approval of their medical assistance plans).

offer benefits in addition to those required by federal rules, and each state is authorized to limit services as long as such limits comply with federal standards.[6]

Alaska's Medicaid program funds "uniform and high quality" medical care for low-income individuals "regardless of race, age, national origin, or economic standing."[7] Medicaid is administered by the Department of Health and Social Services (DHSS); it pays for medical services that are "medically necessary as determined by" statute, regulation, "or by the standards of practice applicable to the provider."[8] Although DHSS's regulations do not define "medically necessary," they state that Medicaid will only pay for services that are "reasonably necessary for the diagnosis and treatment of an illness or injury, or for the correction of an organic system, as determined upon review by the department."[9]

Doctors submit requests for Medicaid reimbursement of services provided to individuals enrolled in the Medicaid program. In Alaska DHSS usually provides Medicaid reimbursement to doctors without requiring prior authorization or a significant review of the claims. Where there is concern about cost-effectiveness, efficacy, fraud, waste, or abuse associated with certain treatments, doctors are required to provide additional documentation of the need for the treatment. In such situations doctors submit the documentation with their payment request. This has been the method used for abortion payments. For a third category of claims, such as surgeries and lengthy hospitalizations, prior authorizations are required. Virtually all claims, regardless of

---

[6]    *See* AS 47.07.030.

[7]    AS 47.07.010.

[8]    7 Alaska Administrative Code (AAC) 105.100(5) (am. 10/1/2011).

[9]    7 AAC 105.110(1) (am. 5/1/2016).

which type of processing they originally received, are subject to Medicaid's post-payment review processes, including audits.

## B. The 1998 Regulation Addressing Medicaid Coverage Of Abortions

This case arises out of a series of legislative and regulatory measures and court decisions involving restrictions on Medicaid funding for abortions. In 1998 DHSS enacted a regulation that brought Alaska's Medicaid coverage of abortions in line with the federal Hyde Amendment.[10] The Hyde Amendment, originally passed in 1976 by the United States Congress, prohibits the use of federal funds "to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest."[11] It has been slightly modified over the years, but remains in effect and continues to limit federal funding for abortion to these two limited circumstances.[12]

In 2001 we affirmed the invalidation of the 1998 regulation based on the Alaska Constitution's equal protection clause,[13] noting that the regulation's denial of funding for "medically necessary abortions"[14] was a departure from "the Medicaid program's purpose of granting uniform and high quality medical care to all needy

---

[10]     7 AAC 43.140 (am. 7/1/98).

[11]     *Harris v. McRae*, 448 U.S. 297, 302 (1980) (quoting Pub. L. 96-123, § 109, 93 Stat. 926).

[12]     *See* H.R. 7, 115th Cong. (2017).

[13]     *See State, Dept. of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.* (*Planned Parenthood 2001*), 28 P.3d 904, 915 (Alaska 2001).

[14]     *Id.* at 905.

persons of this state."[15] We explained that "a woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice" and that "Alaska's equal protection clause does not permit governmental discrimination against either woman."[16] We applied strict scrutiny because the regulation "effectively deter[red] the exercise of" the fundamental constitutional right to reproductive choice "by selectively denying a benefit to those who exercise[d]" that right.[17] We held that the State had failed to present a compelling interest to justify the discrimination.[18] We affirmed the superior court judgment striking down the regulation, effectively reinstating the general Medicaid requirement of medical necessity that had been in place before the promulgation of the regulation.[19] As a result, the Medicaid program would pay for an abortion if it was "medically necessary" according to either the relevant Alaska Medicaid regulations or "the standards of practice applicable to the provider."[20] This continued until DHSS and the legislature adopted the regulation and statute at issue in this case.

**C.      Planned Parenthood Challenges The 2013 Regulation And The 2014 Statute Regulating Medicaid Coverage Of Abortions**

In 2013 DHSS amended the definitions related to Medicaid regulations to

---

[15]      *Id.* at 911 (citing AS 47.07.010 (1972)).

[16]      *Id.* at 913.

[17]      *Id.* at 909.

[18]      *Id.* at 912-13.

[19]      *Id.* at 905-06, 915.

[20]      7 AAC 105.100(5).

require a more detailed certificate to obtain state Medicaid funding for an abortion.[21] The 2013 form[22] required doctors to certify that an abortion was required by one of the two circumstances permitting federal abortion funding under the Hyde Amendment, or that, "in [his or her] professional medical judgment the abortion procedure was medically necessary to avoid a threat of serious risk to the physical health of the woman from continuation of her pregnancy due to the impairment of a major bodily function including but not limited to one of" 21 listed conditions.[23]

---

[21]    In 2012 DHSS had issued a regulation requiring doctors to complete a certificate to request Medicaid payment for an abortion.  7 AAC 160.900(d)(30) (am. 1/16/2013). Under the 2012 regulation, the doctor had to certify whether an abortion met the requirements of the federal Hyde Amendment, or, if not, whether an abortion was "medically necessary."  "Medically necessary" was not defined.

[22]    The regulation, 7 AAC 160.900(d)(30) (am. 2/2/2014), stated only that DHSS adopts "the Certificate to Request Funds for Abortion, revised as of December 2013."  It was the accompanying certificate, not the regulation itself, that outlined the new criteria for medical necessity applicable to abortions.

[23]    *See* 7 AAC 160.900(d)(30).  These conditions are:  (1) diabetes with acute metabolic derangement or severe end organ damage; (2) renal disease that requires dialysis treatment; (3) severe preeclampsia; (4) eclampsia; (5) convulsions; (6) status epilepticus; (7) sickle cell anemia; (8) severe congenital or acquired heart disease class IV; (9) pulmonary hypertension; (10) malignancy where pregnancy would prevent or limit treatment; (11) severe kidney infection; (12) congestive heart failure; (13) epilepsy; (14) seizures; (15) coma; (16) severe infection exacerbated by the pregnancy; (17) rupture of amniotic membranes; (18) advanced cervical dilation of more than 6 centimeters at less than 22 weeks gestation; (19) cervical or cesarean section scar ectopic implantation; (20) pregnancy not implanted in the uterine cavity; and (21) amniotic fluid embolus.

If none of the listed conditions applied, a doctor could indicate that an abortion was necessary due to "another physical disorder, physical injury, physical illness, including a physical condition arising from the pregnancy" or "a psychiatric disorder that places the woman in imminent danger of medical impairment of a major

(continued...)

Planned Parenthood brought suit, arguing that the regulation violated the Alaska Constitution's equal protection guarantee by singling out abortion among Medicaid-funded services for a restrictive definition of medical necessity. The superior court granted a preliminary injunction against enforcement of the regulation in February 2014.

While Planned Parenthood's challenge was pending, the legislature codified a definition of "medically necessary" similar to that in the 2013 DHSS regulation. The enacted statute, AS 47.07.068, provides that DHSS may not pay for an abortion unless it is "medically necessary" or the pregnancy was the result of rape or incest. The statute defines a "medically necessary" abortion as "mean[ing] that, in a physician's objective and reasonable professional judgment after considering medically relevant factors, an abortion must be performed to avoid a threat of serious risk to the life or physical health of a woman from continuation of the woman's pregnancy."[24] Planned Parenthood amended its complaint in May 2014 to include an equal protection challenge to the statute and filed a second motion asking the court to extend the preliminary injunction to include the statute as well as the regulation. The court granted the motion, enjoining implementation of both measures pending the outcome of trial.

At the conclusion of trial in February 2015 the superior court struck down both AS 47.07.068 and 7 AAC 160.900(d)(30) on equal protection grounds, finding that the statute and the regulation impermissibly discriminated against indigent women seeking abortions. The court found that the legislature intended AS 47.07.068 to delineate "a high-risk, high-hazard standard that would preclude funding for most

---

[23]    (...continued)
bodily function if an abortion is not performed."

[24]    AS 47.07.068(b)(3).

Medicaid abortions." The court concluded that the statute's definition of "medically necessary" covered "only abortions required to avoid health detriments attributable to the enumerated conditions, either fully realized or demonstrably imminent." The court determined that the statute and regulation, so construed, violated the Alaska Constitution's equal protection clause, and it permanently enjoined their enforcement. The State appeals.

## III. STANDARD OF REVIEW

We use our independent judgment to review matters of constitutional or statutory interpretation.[25] When interpreting a regulation that does not implicate agency expertise, "we exercise our independent judgment."[26] In the equal protection context our independent review includes "assess[ing] the nature and importance of the competing personal and governmental interests at stake, identify[ing] the relevant level of scrutiny for governmental action, and assess[ing] the means chosen to advance governmental interests."[27] Whether the classes being compared in an equal protection case are "similarly situated" is also a legal question reviewed de novo.[28]

---

[25] *Premera Blue Cross v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007).

[26] *See City of Valdez v. State*, 372 P.3d 240, 246 (Alaska 2016) ("If no agency expertise is involved in the agency's interpretation, we apply the substitution of judgment standard. Under this standard, we exercise our independent judgment, substituting it 'for that of the agency even if the agency's [interpretation] ha[s] a reasonable basis in law.' " (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987))).

[27] *Planned Parenthood of The Great Nw. v. State* (*Planned Parenthood 2016*), 375 P.3d 1122, 1132 (Alaska 2016).

[28] *Id.* at 1136.

## IV.  DISCUSSION

Planned Parenthood argues the Medicaid funding statute is facially unconstitutional because it unconstitutionally discriminates by treating two classes of people unequally — women who seek abortions and women who seek to carry pregnancies to term.[29]  Statutes "may be found to be unconstitutional as applied or unconstitutional on their face."[30]  "We uphold a statute against a facial constitutional challenge if 'despite . . . occasional problems it might create in its application to specific cases, [it] has a plainly legitimate sweep.' "[31]  "A party raising a constitutional challenge to a statute bears the burden of demonstrating the constitutional violation.  A presumption of constitutionality applies, and doubts are resolved in favor of constitutionality."[32]

To determine whether the challenged statute is constitutional we first interpret the statute.[33]  After determining the meaning of the statute, we analyze its constitutionality under Alaska's equal protection doctrine.[34]

---

**29**     *See id.* at 1135; *see also* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209, 1238 (2010) ("[A] 'facial challenge' is nothing more nor less than a claim that Congress (or a state legislature) has violated the Constitution.").

**30**     *State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 372 (Alaska 2009).

**31**     *State v. Planned Parenthood* (*Planned Parenthood 2007*), 171 P.3d 577, 581 (Alaska 2007).

**32**     *See State, Dept. of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001).

**33**     *See Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 386-88 (Alaska 2013).

**34**     *See Planned Parenthood 2016*, 375 P.3d at 1135-36.

Similarly, to determine whether the challenged regulation is constitutional we must interpret the regulation and, once its meaning is determined, assess its constitutionality under Alaska's equal protection doctrine.[35]

## A. Analysis Of The Statute And Regulation

This section analyzes two similar but not identical texts: the statute and the DHSS regulation. We primarily discuss the statute, but our conclusions apply equally to the regulation except where noted.

When "interpreting a statute, we consider its language, its purpose, and its legislative history, in an attempt to 'give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others.' "[36] We begin with the text and its plain meaning, and we use a "sliding-scale approach" to interpret the language.[37] "[T]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[38] When "a statute's meaning appears clear and unambiguous, . . . the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent."[39] If an ambiguous text is susceptible to more than one reasonable interpretation, of which only one is constitutional, the doctrine of constitutional avoidance directs us to adopt the

---

[35]   *Planned Parenthood 2001*, 28 P.3d 904, 908 (Alaska 2001).

[36]   *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003) (quoting *Muller v. BP Expl. (Alaska) Inc.*, 923 P.2d 783, 787 (Alaska 1996)).

[37]   *Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012).

[38]   *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016) (quoting *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 11 (Alaska 2014)).

[39]   *Id.* (quoting *Univ. of Alaska v. Geistauts*, 666 P.2d 424, 428 n.5 (Alaska 1983)).

interpretation that saves the statute.[40]

Both the State and Planned Parenthood argue that the text of the statute unambiguously supports their respective interpretations. Planned Parenthood interprets the statute to allow Medicaid funding for an abortion only when it is the sole treatment available to protect a woman against a serious risk of death or impairment of a major bodily function because of an "explicitly catastrophic" medical condition. The State, on the other hand, reads the statute to provide "a broad and inclusive definition" of medical necessity that allows doctors to use their professional judgment when one of "a wide range of ailments and conditions" elevates the health risks pregnancy poses. The State asserts that the statute "provides reimbursement for any woman who faces . . . a risk greater than the baseline risks of pregnancy" or a "non-trivial" health threat. It posits that such a health threat may sometimes include exacerbation of a physical health condition because of "medically relevant factors" like poor self-care and a lack of secure housing.[41]

---

[40] *See Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 388 (Alaska 2013) (explaining that "[t]he doctrine of constitutional avoidance 'is a tool for choosing between competing plausible interpretations of a statutory text' " such that, if the statute would be unconstitutional under one and valid under the other, "[our] plain duty is to adopt that which will save the Act" (first quoting *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005); then quoting *Rust v. Sullivan*, 500 U.S. 173, 190 (1991))).

[41] The parties devoted some time at trial eliciting testimony about what "medically relevant factors" might include. Several doctors testified that they ask patients about a wide range of information when they begin treatment, including "life[] circumstances that affect[] the probability of receiving treatment," such as whether a patient works the night shift or has access to reliable refrigeration. The State agrees on appeal that factors such as a patient's housing situation and capacity for self-care can be medically relevant factors in evaluating the risks and hazards faced by, for example, a diabetic woman.

### 1. The text of the statute

Statutory interpretation begins with the plain meaning of the statutory text.[42] If the meaning and intent are clear, we do not apply interpretive canons; a canon of construction is only "an aid to the interpretation of statutes that are ambiguous or that leave unclear the legislative intent."[43]

Alaska Statute 47.07.068(a) prohibits Medicaid payment for abortions "unless the abortion services are for a medically necessary abortion or the pregnancy was the result of rape or incest." Subsection (b)(3) defines a "medically necessary abortion" as one that, "in a physician's objective and reasonable professional judgment after considering medically relevant factors . . . must be performed to avoid a threat of serious risk to the life or physical health of a woman from continuation of the woman's pregnancy."[44] Subsection (b)(4) then explains that " 'serious risk to the life or physical health' includes, but is not limited to, a serious risk to the pregnant woman of (A) death; or (B) impairment of a major bodily function because of" any of 21 serious conditions or "another physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy that places the woman in danger of death or major bodily impairment if an abortion is not performed."[45]

---

[42]    *Ward*, 288 P.3d at 98.

[43]    *See West v. Municipality of Anchorage*, 174 P.3d 224, 229 (Alaska 2007) (quoting *Crump v. State*, 625 P.2d 857, 859 (Alaska 1981)) (discussing *ejusdem generis* canon of interpretation).

[44]    AS 47.07.068(b)(3).

[45]    AS 47.07.068(b)(4). There are some differences between the statute's and regulation's lists of conditions. Where the regulation lists "severe kidney infection," the
(continued...)

We conclude that the statute's text is ambiguous because "threat of a serious risk" is not defined. The lack of a clear definition creates an ambiguity regarding whether a woman seeking an abortion will qualify for coverage based on one of the listed medical conditions that authorize reimbursement for the cost of the procedure. The parties' textual dispute centers primarily on subsections (b)(3) and (b)(4) of the statute. We analyze their arguments below, applying canons of construction and other interpretive aids to discern the statute's meaning in order to determine whether it is constitutional.

> a.    **The list of medical conditions and the "catch-all" provision**

The parties dispute the significance of the list of medical conditions in subsection (b)(4) and whether the final "catch-all" provision of the list broadens the permissive scope of the statute in a way that may affect its constitutionality. Planned Parenthood argues that the statute requires a woman both to presently suffer from one of the listed conditions and to be at risk of impairment of a major bodily function because of that condition before Medicaid will pay for an abortion. In contrast, the State asserts that the list merely "serves to illuminate the concept of 'serious risk' by providing examples of the very serious complications that can develop during pregnancy." We conclude that the catch-all provision does not meaningfully expand the permissive scope of the statute.

The statute provides that a "serious risk to the life or physical health" of a woman means "a serious risk to the pregnant woman of . . . death[] or . . . impairment of

---

**45**    (...continued)
statute lists "kidney infection." AS 47.07.068(b)(4)(B)(xi); 7 AAC 160.900(d)(30). Only the regulation refers to psychiatric or mental health disorders. *See* AS 47.07.068(b). Finally, the statute's catch-all provision is more detailed. *See* AS 47.07.068(b)(4)(B)(xxii).

a major bodily function because of" one of 21 conditions.[46] The phrase "impairment of a major bodily function" refers to a serious health problem, though a doctor for Planned Parenthood testified that the phrase is "not medical terminology."[47] At trial one of the State's experts testified that he understood "impairment of a major bodily function" to mean "a change in the major organ system that . . . I think has the potential to lead to a life threatening problem."[48] But a condition might have a permanent effect on physical health without being fairly characterized as causing "impairment of a major bodily function." The 21 listed examples further narrow the category of medical conditions that would qualify a woman for abortion funding. It is not enough for a pregnant woman to face a serious risk to her life or physical health, or even to face a serious risk of acquiring one of the conditions listed in subsection (b)(4). The statute instead requires a woman

---

[46] AS 47.07.068(b)(4). At oral argument the State argued for the first time that because the statutory definition of " 'serious risk to the life or physical health' *includes, but is not limited to*, a serious risk to the pregnant woman," the statute in fact covers a much broader range of health conditions than those explicitly listed in subsection (b)(4). (emphasis added).

[47] The phrase appears to be used primarily in the context of medical exceptions to laws restricting abortion. *See, e.g.*, MICH. COMP. LAWS § 722.902(b) (" 'Medical emergency' means that condition . . . for which a delay in performing an abortion will create serious risk of substantial and irreversible impairment of a major bodily function."); *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 879 (1992) (reviewing a Pennsylvania statute containing similar language); *Isaacson v. Horne*, 716 F.3d 1213, 1218 (9th Cir. 2013) (reviewing an Arizona statute containing similar language). "Major bodily function[]" is also used in the Americans with Disabilities Act to mean "including but not limited to[] functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

[48] Dr. Steven Calvin is an obstetrician and gynecologist who specializes in maternal fetal medicine.

to face "a serious risk of death or [of] impairment of a major bodily function" *caused by* one of those conditions.[49]

Many of the conditions in subsection (b)(4) are quite serious. Preeclampsia, for example, is an adverse reaction by a pregnant woman's immune system to paternal antigens in the placenta. The superior court found that it is "a precursor to numerous modalities of life threatening damage" during the pregnancy and that it entails a currently unquantifiable increased risk of heart disease and stroke 20 years in the future. Ectopic implantation or other implantation outside the uterus will, according to testimony, "almost always kill the woman before the fetus would be viable." Other conditions are less life-threatening but still exacerbated by pregnancy. For example, the superior court noted that the physical stresses of "pregnancy can cause a woman with heart disease to advance to a higher class of functional incapacity" or "entail[] a risk of death" for a woman whose heart defect was previously "relatively asymptomatic." Likewise, sickle cell anemia causes low blood oxygen, which triggers pain crises when a patient's bone marrow increases production of red blood cells. The elevated metabolic demands of pregnancy often increase the frequency of pain crises in women with the condition. There was also testimony that a few of the listed conditions are an odd fit with the list because the circumstances under which they occur can never lead to an abortion or because abortion would almost never mitigate the risk faced by a woman. One of these is amniotic fluid embolus, which one of Planned Parenthood's experts testified occurs during labor and delivery and can only be definitively diagnosed in an autopsy.

The statute's legislative history also supports a restrictive reading of the list in subsection (b)(4). A staff member for the bill's Senate sponsor testified that the federal Hyde Amendment's "death portion [was] the foundation" for the statutory text;

---

[49] AS 47.07.068(b)(4)(B)(xxii).

-16-                                                                7334

the drafters had included an additional provision for "major bodily impairment" in response to our holding in *Planned Parenthood 2001* that Medicaid funding for abortion could not be limited strictly to the Hyde Amendment's standards.[50] And one of the State's medical experts[51] testified before the legislature that he had worked with the bill's sponsor to develop a "list of conditions that unequivocally threaten the life of a mother."[52] The expert stated that the list was intended to be such that a doctor would recommend abortion to a woman with one of the conditions even if she wished to continue the pregnancy.[53]

Although the State correctly notes that the statements of an expert witness should not be given greater weight than those of legislators, this doctor was not merely a witness testifying before the legislature; he worked with the bill's sponsor specifically to create the list of life-threatening conditions incorporated into the statutory language.[54] His testimony therefore reliably informs our understanding of the sponsor's intent. Moreover, the Senate rejected an amendment that would have removed the list of conditions and instead required a doctor to certify an abortion was medically necessary

---

[50] Statement of Chad Hutchinson, Staff Member to Sen. John Coghill at 8:11:10-8:11:42, Hearing on S.B. 49 Before the House Fin. Comm., 28th Leg., 2d Sess. (Feb. 25, 2014).

[51] Dr. John Thorp is an obstetrician who practices in the area of fetal medicine and high risk obstetrics.

[52] Testimony of Dr. John Thorp, at 2:19:41-2:20:56, Hearing on S.B. 49 Before the Sen. Jud. Comm., 28th Leg., 1st Sess. (Feb. 27, 2013) (hereinafter Dr. Thorp Testimony).

[53] *Id.* at 2:21:10-2:21:34.

[54] *Id.* at 2:19:41-2:20:56.

based on all the information available to the doctor.[55]  This rejection suggests the list of conditions was meant to restrict physicians' discretion and that this restriction was important to the legislature's intent.

The statute's list of conditions in subsection (b)(4) includes a final catch-all provision that reads, "another physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy that places the woman in danger of death or major bodily impairment if an abortion is not performed."[56]  The State argues that this catch-all provision broadens the permissive scope of the statute.  Because the phrase "another physical disorder, physical injury, or physical illness" contains no severity requirement,[57] this portion of the provision could, by itself, be interpreted to broaden the scope of the covered conditions.  Indeed, a State medical expert testified that he saw this provision as "a barn door" that provides "a large opening" for doctors to receive payment for abortions.

But the language immediately following that phrase explains what is required for coverage under this provision:  "a life-endangering physical condition caused by or arising from the pregnancy that places the woman in danger of death or major bodily impairment if an abortion is not performed."[58]  This qualifying language emphasizes the severity of the conditions intended to be covered by the catch-all provision.  The physical condition must not only be "life-endangering," but it must also, somewhat redundantly, "place[] the woman in danger of death or major bodily

---

[55]    2013 Senate Journal 1074-75.

[56]    AS 47.07.068(b)(4)(B)(xxii).

[57]    *Id*.

[58]    AS 47.07.068(b)(4)(B)(xxii).

impairment."[59]  This duplicative reference to the danger of death, as well as the fact that the language of the catch-all provision almost exactly mirrors the current language of the Hyde Amendment,[60] indicates how serious a condition must be to qualify for coverage under the catch-all provision.

The meaning of the catch-all provision is also shaped by the list of conditions preceding it.  Physicians for both parties testified that these conditions are serious and, for some, life-threatening.  Under the interpretive canon *ejusdem generis*, when a general term follows specific terms, the general term "will be interpreted in light of the characteristics of the specific terms, absent clear indication to the contrary."[61]  The specific terms here are serious conditions that can be life-threatening, so a non-listed condition must be similarly dangerous to qualify for coverage under the catch-all

---

[59]     *Id.*

[60]     The 2014 version of the federal Hyde Amendment provided that federal funds could not be used for abortion coverage unless:

> the pregnancy is the result of an act of rape or incest; or . . . a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, §§ 506-507, 128 Stat. 409 (2014).

[61]     *See City of Kenai v. Friends of Recreation Ctr., Inc.*, 129 P.3d 452, 459 (Alaska 2006) (quoting *West v. Umialik Ins. Co.*, 8 P.3d 1135, 1141(Alaska 2000)); *ejusdem generis*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed.").

provision. We therefore conclude that the catch-all provision does not meaningfully expand the permissive scope of the statute.[62]

### b. The meaning of "threat of serious risk"

The statute provides that a "medically necessary abortion" is one that "must be performed to avoid a threat of serious risk to the life or physical health" of a pregnant woman.[63] The statute defines "serious risk to the life or physical health" in great detail,[64] but the precise meaning of "*threat of* serious risk" is contested by the parties. The State asserts that the language significantly attenuates the statute's severity because both "threat" and "risk" entail probabilities: a woman is not required to face a "serious risk to [her] life or physical health" to qualify for Medicaid funding; she is merely required to face a *threat* of such risk. Planned Parenthood argues that, because all pregnant women face an elevated health risk, the State's reading would cover all pregnant women and thereby render the rest of the statute superfluous.

"Threat of serious risk" is not an expression with a recognized legal meaning in Alaska or elsewhere in the United States.[65] In the absence of prior

---

[62]   The dissent's argument at page 6 that we should elevate the catch-all phrase "by itself" in order to uphold the statute disregards the long-established legal rules that must govern our analysis.

[63]   AS 47.07.068(b)(3).

[64]   AS 47.07.068(b)(4).

[65]   This expression occurs in several statutory provisions creating medical emergency exceptions to laws about abortion or about prescription of opioids to minors. *See* OHIO REV. CODE ANN. §§ 2919.12(C)(2), 2919.121(D), 3701.791(A), 3719.061(A)(1)(b) (West 2016); 35 PA. STAT. AND CONS. STAT. ANN. § 52A01 (West 2016). Although the phrase has been quoted twice in our abortion jurisprudence, neither we nor any other court have construed its meaning. *See Planned Parenthood 2016*, 375 P.3d 1122, 1159 n.18 (Alaska 2016) (Stowers, J., dissenting); *Planned Parenthood*
(continued...)

interpretations of this language, its meaning must be established by the text and context of the statute.

"Risk" can mean "[t]he possibility of suffering harm or loss; danger" or "[a] factor, thing, element, or course involving uncertain danger"[66] — for example, "Professional snowboarders take many risks." It can also mean, in a more statistical sense, "chance of loss" or "degree of probability of such loss"[67] — for example, "Bicycling without a helmet entails a risk of head injury." Used alone, "risk" tends to encompass the combination of probability and hazard, leaving the specific hazards to context and the reader's imagination. But when connected to an explicit hazard ("risk of ____"), "risk" generally means probability.

Although AS 47.07.068(b)(3)'s reference to "serious risk to the life or physical health of a woman" uses "risk" alone, and not as part of the phrase "risk of ____," the next section, (b)(4), goes on to define "serious risk" to mean "serious risk . . . *of* . . . death[] [or] . . . impairment of a major bodily function."[68] In this context, "risk" is most naturally read as the probability of the specified harm.

Like "risk," "threat" may connote two slightly different concepts. The American Heritage Dictionary defines "threat" as "[a]n indication of impending danger

---

[65]    (...continued)
*2007*, 171 P.3d 577, 580 n.7 (Alaska 2007).

[66]    THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1514 (5th ed. 2016).

[67]    *Id.*

[68]    AS 47.07.068(b)(4) (emphasis added).

or harm."[69] The expression "threat of _____" may be read in two ways. One emphasizes the sense of "threat" as hazard: we might read "a threat of flooding" as an impending hazard *consisting of* flooding. The other emphasizes the sense of "threat" as relatively high probability: "a threat of frost overnight" implies a reasonable likelihood of frost.

In the context of the statute, only the first sense of the word "threat" is appropriate. As we have explained, "risk" as used in the statute must mean probability. If "threat" also meant probability, then the statute's "threat of serious risk . . . of . . . death[] or impairment" would mean "probability of serious probability . . . of death or . . . impairment."[70] As the State would have us read the statutory text, this multiplying of probabilities would mean that the statute covers abortions even when there is a relatively low absolute risk of serious harm, as long as the doctor has an articulable medical reason for believing the woman faces a greater degree of risk than normal. The statute's text, however, provides no reason to draw the line at "higher than normal risk." Because all pregnant women face some risk of pregnancy-induced conditions like preeclampsia, the statute would sanction funding for all abortions if read to include such an attenuated health risk. But such an interpretation would render the limiting language and list of conditions in subsection (b)(4) superfluous[71] and is not supported by the available legislative history. There is no indication in the legislative record that "threat

---

[69]    THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1813 (5th ed. 2016).

[70]    AS 47.07.068(b)(3)-(4).

[71]    *See Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) ("We . . . presume 'that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.' " (quoting *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 530-31 (Alaska 1993))).

of serious risk" was meant to play the attenuating role the State has proposed. If the legislature had intended "threat of serious risk" to significantly reduce the severity of the statute's restrictions, we would expect to see some discussion of that phrasing and its effect somewhere in the legislative history. But the legislative record contains no such discussion.

We therefore construe "threat of serious risk [of death, or of impairment from a listed harm]" to mean "impending hazard consisting of a serious probability [of death, or of impairment from a listed harm]."[72] This interpretation does not require that a woman suffer one of the listed conditions for her abortion to be covered by Medicaid, but it also does not mean that suffering from a listed condition is sufficient.

### c.    Coverage of mental health conditions and lethal fetal anomalies

The statute does not explicitly refer to mental health or include any psychological disorders in its list of conditions.[73] The catch-all provision specifically limits its coverage to "another *physical* disorder, *physical* injury, or *physical* illness."[74] But a psychological condition that entails a serious risk of death could conceivably be covered by subsection (b)(4)(A), which permits coverage for "serious risk to the pregnant woman . . . of death" without the caveat that the risk of death must be presented by a physical condition.

At trial the State argued that this provision of the statute could be interpreted to cover "only a very extreme mental health condition" where a woman was

---

[72]    This is essentially what the superior court did when it resolved the interpretive challenge by construing the phrase to mean "threat [consisting] of a serious risk." (Alteration in original).

[73]    *See* AS 47.07.068(b)(4)(B).

[74]    AS 47.07.068(b)(4)(B)(xxii) (emphasis added).

suffering from "suicidal ideation where there was a risk of death." We agree. The statute cannot be construed to cover any other mental health condition, or to cover women with mental health conditions like bipolar disorder whose medications pose a risk to the fetus.[75]

The legislative history indicates that lawmakers intended to exclude mental health from the statutory definition of medical necessity. The House rejected an amendment that would have recognized medical necessity where "a psychiatric disorder . . . places the woman in imminent danger of medical impairment of a major bodily function."[76] The bill's Senate sponsor, when asked why bipolar disorder was not covered by the bill, replied that he believed, based on medical testimony and expert advice, that "most psychological conditions were not a threat to the health of a pregnant woman."[77]

---

[75] There are numerous conditions that may be treated with medications that can affect or disturb the development of a fetus. We discussed bipolar disorder as an example of such a mental health condition in our *Planned Parenthood 2001* decision. 28 P.3d 904, 907 (Alaska 2001) ("[W]omen who suffer from conditions such as . . . bipolar disorder face a particularly brutal dilemma as a result [of the] regulation — medication to control their own . . . symptoms can be highly dangerous to a developing fetus. Without funding for medically necessary abortions, pregnant women with these conditions must choose either to seriously endanger their own health by forgoing medication, or to ensure their own safety but endanger the developing fetus by continuing medication.").

[76] 2014 House Journal 2337.

[77] Statement of Sen. John Coghill at 8:24:44-8:26:20, Hearing on S.B. 49 Before House Fin. Comm., 28th Leg., 2d Sess. (Feb. 25, 2014).

The statute also does not cover abortions when the fetus suffers from a fatal anomaly.[78] The statute[79] states that an abortion must be necessary to avoid the risk of harm to the life or physical health of a pregnant woman.[80] The text does not leave room to consider an abortion medically necessary based on the suffering of the fetus. The bill's sponsor indicated that he believed fatal fetal abnormalities would be covered under the bill's catch-all provision.[81] But this statement, unsupported by other evidence from the legislative history, is not sufficient to overcome the plain meaning of the statute.[82] The statute therefore cannot reasonably be interpreted to cover abortions in the case of fatal fetal anomalies.

The State urges us to apply the canon of constitutional avoidance, arguing that the superior court improperly ignored a reasonable interpretation of the statute that would have been constitutional. The canon of constitutional avoidance requires us to choose the constitutionally permissible interpretation from among reasonable interpretations of an ambiguous statute.[83] But the legislative history makes clear that the State's interpretation, which the dissent embraces, is not reasonable in this case. The statute's text is ambiguous because "threat of a serious risk" is not defined. We do not

---

[78]    Trial testimony referred to examples of such anomalies, including anencephaly, a neural tube defect in which there is no covering for the brain, and renal agenesis when the fetus has no kidneys.

[79]    As well as the certificate required by the regulation.

[80]    *See* AS 47.07.068(b)(3); 7 AAC 160.900(d)(30).

[81]    Statement of Sen. John Coghill at 9:13:49-9:14:11, Hearing on S.B. 49 Before the House Fin. Comm., 28th Leg., 1st Sess. (Apr. 1, 2013).

[82]    *See State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016).

[83]    *See Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 388 (Alaska 2013).

find the catch-all provision meaningfully expands the statute's coverage. Thus we read "threat of a serious risk" to mean an impending hazard consisting of a serious probability of death, or of impairment because of a listed harm.

## 2. The text of the regulation

Although the regulation is structured somewhat differently from the statute, we apply similar analytical methods to interpret its text.[84] As we have discussed, a woman must suffer a threat of serious risk of death or impairment of a major bodily function *caused by* one of the listed medical conditions in order to be eligible for Medicaid funding for an abortion according to the statute.[85]

The regulation introduces its list of medical conditions differently. The regulation requires a doctor to certify that an abortion "was medically necessary to avoid a threat of serious risk to the physical health of a woman from continuation of her pregnancy due to the impairment of a major bodily function including but not limited to one of the following" conditions.[86] Pursuant to the regulation each listed condition is *itself* an "impairment of a major bodily function" or a "serious risk to the physical health

---

[84] *See Pease-Madore v. State*, 414 P.3d 671, 675 (Alaska 2018); *Wilson v. State, Dep't. of Corr.*, 127 P.3d 826, 829 (Alaska 2006). Though we apply similar methods to interpret the regulation and the statute, the regulation is not entitled to the same presumption of constitutionality. *See State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001) (explaining the canon of constitutional avoidance "recognizes that the legislature, like the courts, is pledged to support the state and federal constitutions and that the courts, therefore, should presume that the legislature sought to act within constitutional limits"); *Planned Parenthood 2001*, 28 P.3d 904, 913 (Alaska 2001).

[85] AS 47.07.068(b)(4)(B)(xxii).

[86] *See* 7 AAC 160.900(d)(30) (adopting the revised Certificate to Request Funds for Abortion).

of the woman."[87]  This contrasts with the statute, under which suffering from such a condition does not suffice unless there is also a threat of serious risk of death or impairment of a major bodily function caused by the pregnancy.[88]  A serious risk of acquiring any of the listed conditions is therefore sufficient for coverage under the regulation.  However, as with the statute, the risk posed to a woman's health must be greater than the baseline health risk inherent in pregnancy — otherwise this entire portion of the regulation would be surplusage.

A second difference from the statute is the regulation's catch-all provision, which covers "another physical disorder, physical injury, [or] physical illness, including a physical condition arising from the pregnancy."[89]  The regulation does not include the statute's additional language emphasizing the danger of death; it simply indicates that physical conditions caused by pregnancy fall under the catch-all provision.  But like the statute, the preceding listed conditions constrain the meaning of the catch-all under the canon of *ejusdem generis*.  Considering the regulation's inclusion of the listed conditions in the definition of "serious risk to the physical health of the woman" with the catch-all provision demonstrates that the regulation is somewhat less restrictive than the statute.

A third difference is the regulation's treatment of mental health conditions.  One of the conditions listed in the regulation is "a psychiatric disorder that places the woman in imminent danger of medical impairment of a major bodily function if an abortion is not performed."  Although the statute's coverage of mental health conditions is effectively limited to suicide, the regulation appears to cover imminent and serious self-harm short of suicide.  But as one testifying physician noted, these cases "represent

---

[87]     *Id*.

[88]     *See* AS 47.07.068.

[89]     *See* 7 AAC 160.900(d)(30).

a tiny fraction of patients with psychiatric symptoms." The regulation thus covers psychiatric disorders to a very limited extent and does not significantly expand coverage beyond the statute.

Overall the regulation is less restrictive than the statute in its requirement that the pregnancy pose a serious risk to the physical health of the woman. The regulation has a slightly broader catch-all provision and it permits coverage for more mental health conditions. But these differences are not sufficiently less restrictive to meaningfully differentiate coverage under the statute and the regulation.[90]

Having determined the statute and regulation's meanings, we must determine whether they are permissible under the Alaska Constitution. To do this, we assess whether these measures result in unequal treatment of different classes of women, identify the constitutional interest at stake, the State's interest in adopting these measures, and the method the State has employed to address its interest.

## B. Equal Protection Under The Alaska Constitution

"[A] party raising a constitutional challenge to a statute bears the burden of demonstrating the constitutional violation. A presumption of constitutionality applies, and doubts are resolved in favor of constitutionality."[91] "But a statute infringing on a

---

[90] We do not address the issue of whether the passage of the statute impliedly repealed the regulation. This was raised below but not addressed on appeal, so we therefore do not address it. But we note that to the extent that the regulation expands coverage and exceeds the agency's statutory authority, it is invalid. *See Muller v. BP Exploration (Alaska) Inc.*, 923 P.2d 783, 792 n.9 (Alaska 1996); *Powers v. State, Public Emp.'s Ret. Bd.*, 757 P.2d 65, 67 (Alaska 1988) ("[R]egulations made by an agency which exceed its statutory authority are invalid.").

[91] *Harrod v. State, Dep't of Revenue*, 255 P.3d 991, 1000-01 (Alaska 2011) (quoting *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001)).

constitutionally protected right deserves close attention,"[92] and "the State bears a high burden to justify" such laws.[93]

> When equal protection claims are raised, the question is whether two groups of people who are treated differently are similarly situated and therefore are entitled to equal treatment under the constitution. In order to determine whether differently treated groups are similarly situated, we look to the state's reasons for treating the groups differently.[94]

We begin by determining the appropriate comparison classes.[95] We then evaluate whether "the challenged law has a discriminatory purpose or is facially discriminatory — i.e., whether the classes are treated unequally."[96] Our ultimate determination of whether the classes are similarly situated is a legal question: whether, "[u]nder the applicable scrutiny level . . . the stated rationales for the [law] justify discriminating between" the comparison classes.[97]

---

[92]     *Planned Parenthood 2016*, 375 P.3d 1122, 1133 (Alaska 2016) (citing *Planned Parenthood 2001*, 28 P.3d 904, 912 (Alaska 2001); *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1261 (Alaska 1980); *Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 633 (N.J. 2000)).

[93]     *Planned Parenthood 2001*, 28 P.3d at 912.

[94]     *Planned Parenthood 2016*, 375 P.3d at 1135 (emphasis omitted) (quoting *Pub. Emps.' Ret. Sys. v. Gallant*, 153 P.3d 346, 349 (Alaska 2007)).

[95]     *Id.* at 1135.

[96]     *Id.*

[97]     *Id.* at 1136.

Planned Parenthood has brought a facial challenge to the statute and regulation, seeking to invalidate them *in toto*, as enacted.[98] Against such challenges, "we will uphold the statute even if it might occasionally create constitutional problems in its application, as long as it 'has a plainly legitimate sweep.' "[99]

### 1. Comparison classes

The statute and regulation at issue impose different eligibility criteria on pregnant women based on their choice whether to obtain an abortion.[100] In *Planned Parenthood 2001*, we explained that

> a woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice. Alaska's equal protection clause does not permit governmental discrimination against either woman; both must be granted access to state health care

---

[98]    *See State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 372 (Alaska 2009).

[99]    *Planned Parenthood 2016*, 375 P.3d at 1133 (quoting *Planned Parenthood 2007*, 171 P.3d 577, 581 (Alaska 2007)). The State argues that a facial challenge is inappropriate and that we should defer decision on the statute's overall constitutionality until a patient or provider brings an "as-applied" challenge against an actual denial of payment. But Planned Parenthood's argument is that the statute is unconstitutional because it creates a discriminatory standard, not because it would deny funding in particular instances where it would violate the constitution to do so. If the standard is discriminatory, there is no "sweep" of circumstances in which denial of payment under the statute and regulation is "plainly legitimate" or without similar constitutional concerns; in such circumstances "every litigant with standing would necessarily succeed in challenging the statute based upon [the] same reasoning." Scott A. Keller & Misha Tseytlin, *Applying Constitutional Decision Rules Versus Invalidating Statutes In Toto*, 98 Va. L. Rev. 301, 326 (2012). Planned Parenthood's facial challenge is therefore appropriate.

[100]    *See* AS 47.07.068; 7 AAC 160.900(d)(30).

under the same terms as any similarly situated person.[101]

The most appropriate comparison classes are therefore Medicaid-eligible women who seek funding for abortion and Medicaid-eligible women who seek funding for natal and prenatal care.

### 2. Unequal treatment of comparison classes

We employ a three-step equal protection analysis:

First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the challenged enactment . . . . Depending upon the primacy of the interest involved, the state will have a greater or lesser burden in justifying its legislation.

Second, an examination must be undertaken of the purposes served by a challenged statute. Depending on the level of review determined, the state may be required to show only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest.

Third, an evaluation of the state's interest in the particular means employed to further its goals must be undertaken. Once again, the state's burden will differ in accordance with the determination of the level of scrutiny under the first stage of analysis. At the low end of the sliding scale, we have held that a substantial relationship between means and ends is constitutionally adequate. At the higher end of the scale, the

---

[101] 28 P.3d at 913. In that decision, we also compared the State's treatment of women seeking abortions with its treatment of other Medicaid patients in general. *Id.* at 908 ("The State, having established a health care program for the poor, may not selectively deny necessary care to eligible women merely because the threat to their health arises from pregnancy."). But the more relevant comparison for the purposes of our equal protection analysis in this case is the State's different treatment of women depending on their decision whether to carry their pregnancy to term. This is because, as we explain below, the State's different treatment of these two groups has a material impact on the exercise of their fundamental right of reproductive choice.

fit between means and ends must be much closer. If the purpose can be accomplished by a less restrictive alternative, the classification will be invalidated.[102]

### a. The constitutional interest at stake

In the first step of our analysis, we "evaluat[e] the importance of the personal right infringed upon to determine the State's burden in justifying its differential" treatment.[103] A statute or regulation that burdens the exercise of a constitutional right "is subject to the most searching judicial scrutiny,"[104] and "it has long been established that a law burdening the fundamental right of reproductive choice demands strict scrutiny."[105] The challenged legislation need not expressly forbid the exercise of the right; we also apply strict scrutiny "where the government, by selectively denying a benefit to those who exercise a constitutional right, effectively deters the exercise of that right."[106] Such scrutiny is particularly called for where, as in this instance, the rejection of one option inevitably requires the other.

---

[102]    *Planned Parenthood 2016*, 375 P.3d at 1137 (alteration in original) (quoting *Alaska Pac. Assurance Co. v. Brown*, 687 P.2d 264, 269-70 (Alaska 1984)).

[103]    *Id.*

[104]    *See Planned Parenthood 2001*, 28 P.3d at 909 ("The regulation at issue in this case affects the exercise of a constitutional right, the right to reproductive freedom. Therefore, the regulation is subject to the most searching judicial scrutiny, often called 'strict scrutiny.' ") (footnote omitted).

[105]    *Planned Parenthood 2016*, 375 P.3d at 1137-38 (citing *Planned Parenthood 2001*, 28 P.3d at 909). The State argues that our holding in *Planned Parenthood 2001* that "a law burdening the fundamental right of reproductive choice demands strict scrutiny" was dicta. But our strict scrutiny analysis in *Planned Parenthood 2001* was the primary reasoning for our decision, and we have treated it as authoritative. *See id.* (citing *Planned Parenthood 2001*, 28 P.3d at 909).

[106]    *Planned Parenthood 2001*, 28 P.3d at 909.

Planned Parenthood argues that strict scrutiny applies because, by creating a unique, more onerous, and abortion-specific definition of medical necessity that departs from the physician-discretion standard applied to other Medicaid services, the State "selectively den[ies] a benefit to those who exercise a constitutional right."[107] The State argues that the measures do not selectively deny a benefit because the State will provide payment for abortion "so long as [the procedure] meets the across-the-board requirement for all Medicaid services — that the service is needed to protect the patient's health."[108]

"[W]e look to the real-world effects of government action to determine the appropriate level of equal protection scrutiny."[109] Strict scrutiny applies to the challenged measures because they discriminate between classes of pregnant women based on their "choice whether or when to bear children" in a manner that deters the free exercise of that choice.[110] The State argues that Medicaid funding for many types of medical services is similarly restricted, so AS 47.07.068 does not uniquely burden women's exercise of the choice to seek an abortion. But the State's funding of healthcare services unrelated to natal and prenatal care does not dictate our analysis here,

---

[107] *See id.*

[108] We held in *Planned Parenthood 2001* that the government "is constitutionally bound to apply neutral criteria in allocating health care benefits" and referred to existing restrictions related to "medical necessity, cost and feasibility" as examples of "politically neutral criteria." *Id.* at 910. But the State's argument assumes that medical necessity is inherently a neutral criterion. Our holding was that neutral criteria must underlie the State's funding restrictions, not that *any* definition of medical necessity is per se neutral. *See id.* If that were so, the legislature could have overruled *Planned Parenthood 2001* simply by reenacting the invalidated regulation in the form of a definition of medical necessity.

[109] *Id.*

[110] *See Valley Hosp. Ass'n. v. Mat-Su Coal. for Choice*, 948 P.2d 963, 968 (Alaska 1997).

because the State's subsidy of other forms of treatment does not influence the exercise of a pregnant woman's fundamental right to choose whether to keep or terminate her pregnancy.[111]

Dissenting in the 1980 United States Supreme Court case *Harris v. McRae*, Justice Brennan explained how disparate government subsidies for medical expenses associated with childbirth and abortion affect fundamental rights:

> A poor woman in the early stages of pregnancy confronts two alternatives: she may elect either to carry the fetus to term or to have an abortion. In the abstract, of course, this choice is hers alone, and the Court rightly observes that the Hyde Amendment "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy." But the reality of the situation is that the Hyde Amendment has effectively removed this choice from the indigent woman's hands. By funding all of the expenses associated with childbirth and none of the expenses incurred in terminating

---

[111] The challenged statute and regulation are uniquely severe in comparison to these other Medicaid restrictions. Perhaps the only other Medicaid service similarly restricted is waiver services for "children with complex medical conditions," who must have "a severe, chronic physical condition that results in a prolonged dependency on medical care or technology to maintain health and well-being" and who must "experience[] periods of acute exacerbation or life-threatening conditions" requiring either "frequent or life-saving administration of specialized treatment or . . . mechanical support devices." 7 AAC 130.205(d)(1)(C)-(D), (F) (am. 7/1/2013). Less severe restrictions apply to certain other services. For example, hysterectomies must be "performed for medical reasons" and not purely for sterilization. 7 AAC 110.420(a)(2), (b) (eff. 2/1/2010). And payment for cosmetic surgery is prohibited unless "required" for "repair of an injury," "improvement of the functioning of a malformed body member," or "correction of a visible disfigurement that would materially affect the recipient's acceptance in society." 7 AAC 105.110(4)(A)-(C) (am. 7/1/2013). But most Medicaid services are not restricted in this way, and DHSS noted that its fiscal agent "generally presumes that a physician provided a medically necessary service."

pregnancy, the Government literally makes an offer that the indigent woman cannot afford to refuse.[112]

In *Planned Parenthood 2001*[113] we expressed our own disagreement with the Court's decision in *Harris*, and Justice Brennan's logic implicitly underlay our decision: the State burdens the exercise of a fundamental right for indigent people when it only subsidizes the inevitable alternative.[114]

Virtually all medical services for indigent Alaskan women who choose to give birth fall under Medicaid's omnibus definition of "medically necessary" as something determined "by the standards of practice applicable to the provider."[115] Expectant mothers generally receive state funding automatically when a doctor submits the bill. Yet an indigent woman seeking state funding for an abortion under the new measures cannot obtain coverage unless a doctor certifies that her "abortion must be performed to avoid a threat of serious risk to [her] life or physical health."[116] This difference results in the coercive effect that troubled Justice Brennan: an indigent woman whose condition falls outside the new, abortion-specific definition of medical necessity will discover that she alone must pay for the medical costs associated with

---

[112]    448 U.S. 297, 333-34 (1980) (Brennan, J., dissenting) (citation omitted) (quoting *Harris*, 448 U.S. at 315).

[113]    28 P.3d at 911 n.52.

[114]    Several other state courts striking down Medicaid abortion funding restrictions on equal protection grounds have relied on similar logic as that expressed in Justice Brennan's dissent. *See, e.g.*, *Comm. to Defend Reprod. Rights v. Myers*, 625 P.2d 779, 793 (Cal. 1981); *Moe v. Sec'y of Admin. & Fin.*, 417 N.E.2d 387, 402 (Mass. 1981); *Women of State of Minn. by Doe v. Gomez*, 542 N.W.2d 17, 29 (Minn. 1995).

[115]    *See* 7 AAC 105.100(5).

[116]    AS 47.07.068(b)(3).

abortion — but if she chooses childbirth, the government will pay any bill that her doctor submits.[117] Thus "the government, by selectively denying a benefit to those who exercise a constitutional right, effectively deters the exercise of that right."[118]

The State warns that application of strict scrutiny to the measures here could endanger all Medicaid funding by subjecting all of the State's limits on Medicaid coverage to strict scrutiny based on the fundamental right "to make decisions about medical treatments for oneself or one's children."[119] We do not believe that it will have such a sweeping impact.

Disparate restrictions on government funding for women based on their choice of either abortion or childbirth deter the exercise of a fundamental right because pregnant women in that position are locked in a binary dilemma: the rejection of one option inevitably entails the embrace of the other. Few other Medicaid treatments present this dilemma. For instance, Medicaid pays for tubal ligations and vasectomies with no special restrictions but will not pay for infertility or impotence services.[120] The government in that situation arguably funds one exercise of a fundamental right and not the other, but it does not create a deterrent or incentive effect. A woman denied funding for fertility treatment is not compelled to obtain a tubal ligation. But biological reality requires that a woman who cannot afford a medical abortion must carry her pregnancy to term. A woman who cannot afford to obtain a medical abortion is also legally prevented from obtaining an abortion otherwise. Alaska law requires abortions to be

---

[117]    *See Harris*, 448 U.S. at 333-34 (Brennan, J., dissenting).

[118]    *Planned Parenthood 2001*, 28 P.3d at 909.

[119]    *Huffman v. State*, 204 P.3d 339, 346 (Alaska 2009).

[120]    7 AAC 105.110(10), (11).

performed by a licensed physician.[121]

Because we are unpersuaded that applying strict scrutiny to the statute and regulation before us would endanger all Medicaid funding, and because the constitutional issue at stake is fundamental, we apply strict scrutiny to both of the challenged measures.

### b.    The State's interest

The State must show that the measures serve a compelling state interest in order for the statute and regulation to withstand strict scrutiny.[122]  The State asserts an interest in limiting the provision of medical care to that which is "medically necessary," thereby ensuring the financial viability of the Medicaid program as a whole.  It argues that "the feasibility of a program like Medicaid depends on the ability to set limits.  The State could not afford, nor would the public tolerate, a Medicaid program that paid for any medical service or treatment a Medicaid beneficiary wants."  Legislators' concern for Medicaid's fiscal viability is generally supported by the record.  The Senate sponsor's staff member stated that one impetus behind the bill was the Senator's "reasonable belief" that Medicaid has been paying for non-medically necessary abortions,[123] and the bill's House sponsor characterized the bill as a "fiscal bill."[124]

But the legislative record contains no evidence that Medicaid had actually funded non-medically necessary abortions.  The Senate sponsor later acknowledged that

---

[121]    AS 18.16.010(a)(1).

[122]    *See Planned Parenthood 2016*, 375 P.3d 1122, 1138 (Alaska 2016); *Planned Parenthood 2001*, 28 P.3d at 909.

[123]    Statement of Chad Hutchinson, Staff Member to Sen. John Coghill at 1:38:27-1:38:38, Hearing on S.B. 49 Before the House Jud. Comm., 28th Leg., 1st Sess. (Mar. 29, 2013).

[124]    Statement of Rep. Gabrielle LeDoux at 1:12:46-1:12:55, Hearing on H.B. 173 Before the House Jud. Comm., 28th Leg., 1st Sess. (Mar. 29, 2013).

the legislature had not determined whether the bill would save the State any money.[125] And DHSS's fiscal note regarding the proposed legislation stated that the Department was unable to determine the bill's impact on expenditure due to a lack of data.[126] This lack of evidence about the bill's fiscal impact casts doubt on legislators' statements that it was intended to resolve a fiscal problem. If the State is arguing that it has a compelling interest in saving money, we have rejected cost savings alone as a legitimate state interest to discriminate.[127] We assume without deciding that the State may have a compelling interest in ensuring the financial viability of Medicaid,[128] but even assuming so does not change the outcome in this case.

### c. The means employed to accomplish the State's interest

Under strict scrutiny we examine whether the means-to-end fit between the

---

[125]    Statement of Sen. John Coghill at 9:15:39-9:15:47, Hearing on S.B. 49 Before the Sen. Fin. Comm., 28th Leg., 1st Sess. (Apr.1, 2013).

[126]    House Fin. Comm., DHSS Fiscal Note of S.B. 49, 28th Leg., 1st Sess. (Feb. 28, 2014).

[127]    *See State v. Schmidt*, 323 P.3d 647, 663 (Alaska 2014) (explaining that, even under minimum scrutiny, the State's legitimate interest in cost savings was not sufficiently related to discriminatory classification because " 'cost savings alone are not sufficient government objectives under our equal protection analysis.' The government can adequately . . . minimize cost without discriminating between similarly situated classes." (quoting *Herrick's Aero-Auto-Aqua Repair Serv. v. State, Dep't of Transp. & Pub. Facilities*, 754 P.2d 1111, 1114 (Alaska 1988))).

[128]    *See* AS 47.07.010 ("It is equally a matter of public concern that providers of [Medicaid] services . . . should operate honestly, responsibly, and in accordance with applicable laws and regulations in order to maintain the integrity and fiscal viability of the state's medical assistance program."); *U.S. v. Lee*, 455 U.S. 252, 258-59 (1982) (holding that the federal government's "interest in assuring mandatory and continuous participation in and contribution to the social security system is very high" because such participation "is indispensable to the fiscal vitality of the social security system").

State's purpose and the challenged measures is sufficiently close.[129] Our equal protection analysis does not ask what interests might justify restricting funding for abortion *specifically*, but what interests would justify treating abortion *differently* from childbirth and other pregnancy care — the statute and regulation should be neither under-inclusive nor over-inclusive.[130] The State bears the burden of proving "that the means it has chosen to advance [its] goals are well-fitted to the ends."[131]

We have recognized that the State may limit Medicaid expenditures by employing neutral criteria such as medical necessity to prioritize funds.[132] But the State's argument about the fiscal implications of AS 47.07.068 and 7 AAC 160.900(d)(30) is unconvincing. An abortion costs the State significantly less than a hospital delivery. Evidence at trial established that abortions range in cost from $650-$750 during the first trimester to $900-$1,000 during the second trimester. In contrast the superior court found that "[a] typical hospital delivery costs Medicaid approximately $12,000."[133] If the abortion funding restrictions divert a significant number of Medicaid-eligible women toward childbirth and its additional expenses, as the State conceded similar restrictions

---

[129] *See Alaska Pac. Assurance Co.*, 687 P.2d at 270.

[130] *See Planned Parenthood 2016*, 375 P.3d at 1139 ("If the means-to-end fit between the State's purpose and the Notification Law is not close enough — if the Notification Law is under-inclusive or over-inclusive — then it will not survive strict scrutiny." (citing *State v. Ostrosky*, 667 P.2d 1184, 1193 (Alaska 1983))).

[131] *Planned Parenthood 2001*, 28 P.3d 904, 909 (Alaska 2001).

[132] *See Planned Parenthood 2001*, 28 P.3d at 910 (noting that the State may use criteria such as "expense, medical feasibility, or the necessity of particular services" in allocating healthcare benefits); *Alaska Pac. Assurance Co.*, 687 P.2d at 272.

[133] Even accounting for the 50% matching subsidy that the federal government provides for most Medicaid procedures other than abortion, pregnancy and delivery care remains significantly more expensive to the State on average.

would in *Planned Parenthood 2001*,[134] then, as Planned Parenthood argues, the funding restrictions will "undermine, rather than further, the State's interest in reducing costs."

Even if measures are not financially counterproductive in practice, they are an under-inclusive means of accomplishing the State's objectives. The State claims there is no need to put similar restrictions on medical services offered to pregnant women carrying to term because such services "almost always serve to protect the health of the woman or fetus." But the State offers no support for this claim, and evidence in the record supports the opposite conclusion. A State expert testified that there are a number of elective pregnancy-related treatments such as scheduled Caesarean sections and inductions of labor "that mothers might request that . . . may not be in their best interests medically in the long run." And a Planned Parenthood expert witness testified that the American College of Obstetrics and Gynecology has recently been scrutinizing elective, or "non-medically indicated," Caesarean sections and inductions of labor. Yet both of these "non-medically indicated" procedures, which do not necessarily serve to protect the health of the mother, are funded by Medicaid, and neither one requires special certification of medical necessity. The measures are thus under-inclusive; the statute and regulation single out only one among multiple purportedly "elective" procedures available to pregnant women for restrictive funding requirements.

We conclude that the statute and regulation are not narrowly tailored to meet the ends of preserving Medicaid funds, and the State has not shown that the differences between the affected classes justify the discriminatory treatment imposed by AS 47.07.068 and 7 AAC 160.900(d)(30).

---

[134]    *See* 28 P.3d at 911.

## V.     CONCLUSION

The judgment of the superior court is AFFIRMED.

STOWERS, Chief Justice, dissenting.

The doctrine of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text." Under this tool, **"as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [our] plain duty is to adopt that which will save the Act."**[1]

In *State, Department of Health & Social Services v. Planned Parenthood of Alaska, Inc.* (*Planned Parenthood 2001*), this court ruled that the State must provide Medicaid funding for medically necessary abortions.[2] The court did not define the term "medically necessary."[3]

*Planned Parenthood 2001* addressed a challenge to a state regulation that limited Medicaid funding for abortions. The regulation mirrored federal criteria for funding of abortions — the so-called "Hyde Amendment" — which provides that federal funds may not be used to pay for an abortion unless the pregnancy threatens the woman's life or is the result of rape or incest.[4] The superior court held that the State's regulation violated the Alaska Constitution's right to privacy.[5] On appeal, this court affirmed on a different basis, ruling that the regulation violated the Alaska Constitution's equal protection clause because it denied funding for medically necessary care for low-income

---

[1]    *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 388 (Alaska 2013) (emphasis added) (first quoting *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005); then quoting *Rust v. Sullivan*, 500 U.S. 173, 190 (1991)).

[2]    28 P.3d 904 (Alaska 2001).

[3]    *Id.*

[4]    *Id.* at 907 n.8.

[5]    *Id.* at 907.

Alaskans.[6]  But the court limited its holding to the requirement that the State fund medically necessary abortions, stating that the case did "not concern State payment for elective abortions."[7]

After this court's decision, the State adopted the definition for "medically necessary" abortions that the superior court had incorporated into its injunction.  The superior court defined "medically necessary" abortions as "those abortions certified by a physician as necessary to prevent the death or disability of the woman, or to ameliorate a condition harmful to the woman's physical or psychological health."  This was to be "determined by the treating physician performing the abortion services in his or her professional judgment."

Eventually state officials attempted to create a standard that would effectively distinguish between elective and medically necessary abortions.[8]  In 2013 the Department of Health and Social Services (DHSS)  adopted a regulation defining when an abortion is "medically necessary" for purposes of Medicaid coverage.[9]  Planned Parenthood brought suit, arguing that the regulation violated Alaska's equal protection guarantee by singling out abortion among Medicaid-funded services under a restrictive definition of medical necessity.  The superior court agreed with Planned Parenthood and granted a preliminary injunction against the regulation.

---

[6]    *Id.* at 913.

[7]    *Id.* at 905.

[8]    Minutes, Sen. Fin. Comm. Hearing on S.B. 49, 28th Leg., 1st Sess.  (March 29, 2013), http://www.akleg.gov/pdf/28/M/SFIN2013-03-290908.PDF.

[9]    7 Alaska Administrative Code (AAC) 160.900(d)(30)(2015).

In 2014 the Alaska Legislature passed a law creating a slightly different definition of medical necessity.[10]  The resulting statute, AS 47.07.068, provides that Medicaid will not pay for abortion services unless they are for a medically necessary abortion or the pregnancy is the result of rape or incest.[11]  The statute defines when an abortion is medically necessary:

> "medically necessary abortion" means that, in a physician's objective and reasonable professional judgment after considering medically relevant factors, an abortion must be performed to avoid a threat of serious risk to the life or physical health of a woman from continuation of the woman's pregnancy.[12]

The statute further defines "serious risk to the life or physical health" to include, but not be limited to, "a serious risk to the pregnant woman of (A) death; or (B) impairment of a major bodily function because of" any one of 21 enumerated medical conditions, with a catch-all provision:

> another physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy that places the woman in danger of death or major bodily impairment if an abortion is not performed.[13]

Planned Parenthood amended its complaint to include the statute, and the superior court extended its preliminary injunction to enjoin the statute.  After trial the

---

[10]    Act of July 16, 2014, ch. 8, § 2, 2014 Alaska Sess. Laws 1 (codified at AS § 47.07.068).

[11]    AS 47.07.068(a).  The provision for pregnancies resulting from rape or incest mirrors the federal Hyde Amendment.  *See* 42 U.S.C. § 1397ee(c)(1) (2012).

[12]    AS 47.07.068(b).

[13]    AS 47.07.068(b)(4).

superior court struck down both AS 47.07.068 and 7 AAC 160.900(d)(30) on equal protection grounds, finding that the enactments impermissibly discriminated against indigent women seeking abortions. The court found that the legislature intended AS 47.07.068 to delineate "a high-risk, high-hazard standard that would preclude funding for most Medicaid abortions." The court concluded that the statute's definition of "medically necessary" covered "only abortions required to avoid health detriments attributable to the enumerated conditions, either fully realizable or demonstrably imminent." The court determined that the statute and regulation, *so construed*, violated Alaska's equal protection clause, and the court permanently enjoined their enforcement.

The State appeals, arguing that the statute and regulation can — and should — be interpreted to avoid finding them unconstitutional. The State argues, among other things, that the statute is entitled to a presumption of constitutionality: a "well-established rule of statutory construction" requires courts "if possible [to] construe statutes so as to avoid the danger of unconstitutionality."[14] It argues "[n]ot only are statutes presumed constitutional, but any doubts are resolved in favor of constitutionality."[15] This rule, the State asserts, "is based on the recognition 'that the legislature, like the courts, is pledged to support the state and federal constitutions and that the courts therefore, should presume that the legislature sought to act within constitutional limits,' "[16] and "also recognizes that '[d]ue respect for the legislative branch of government requires that [the court] exercise [its] duty to declare a statute

---

[14]   *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001).

[15]   *See Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 192 (Alaska 2007).

[16]   *See State v. Rice*, 626 P.2d 104, 108 (Alaska 1981) (citing *Kimoktoak v. State,* 584 P.2d 25, 31 (Alaska 1978)).

unconstitutional only when squarely faced with the need to do so.' "[17]

This court affirms the superior court's decision, holding that the language of the enactments "*compels a 'high-risk, high-hazard' interpretation* akin to that adopted by the superior court . . . [that] imposes different requirements for Medicaid funding eligibility upon women who choose to have abortions than it does upon women who choose to carry their pregnancies to term."[18]

I disagree with the court's interpretative choice. The language of the statute and regulation does not "compel" anything: the language is what it is. It is the *court* that chooses to construe the language in a manner that leads to the conclusion that the enactments are unconstitutional. Where the court goes astray, in my opinion, is its failure to give anything other than lip-service to a well-recognized canon of statutory interpretation: the doctrine of constitutional avoidance. In *Estate of Kim ex rel. Alexander v. Coxe*, we explained that

> [t]he doctrine of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text." Under this tool, "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [our] plain duty is to adopt that which will save the Act."[19]

The court's opinion expressly acknowledges that if an ambiguous statute or regulation "is susceptible to more than one reasonable interpretation, of which only one is constitutional, the doctrine of constitutional avoidance directs us to adopt the

---

[17]    *See State v. ACLU of Alaska*, 204 P.3d 364, 373 (Alaska 2009).

[18]    Op. at 2-3 (emphasis added).

[19]    295 P.3d 380, 388 (Alaska 2013) (footnotes omitted) (first quoting *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005); then quoting *Rust v. Sullivan*, 500 U.S. 173, 190 (1991)).

interpretation that saves the statute" or regulation.[20] But the court fails to make any real effort to construe the challenged provisions to avoid finding the statute and regulation unconstitutional. To the contrary, in reading the main opinion it becomes evident the court goes to great lengths in construing the statute and regulation to ensure that the conclusion of unconstitutionality is inevitable.

The State offers an alternative interpretation that would "save" the enactments. Under AS 47.07.068, the State will fund an abortion when a physician determines that a woman's condition indicates that continuing her pregnancy could put her at serious risk of physical impairment. The State argues AS 47.07.068 employs a broad and inclusive definition of when an abortion is medically necessary for purposes of Medicaid coverage. The court acknowledges the State's arguments in support of "saving" the statute. For example, the court explains:

> The statute's list of conditions in subsection (b)(4) includes a final catch-all provision that reads, "another physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy that places the woman in danger of death or major bodily impairment if an abortion is not performed." The State argues that this catch-all provision broadens the permissive scope of the statute. *Because the phrase "another physical disorder, physical injury, or physical illness" contains no severity requirement, this portion of the provision could, by itself, be interpreted to broaden the scope of the covered conditions.* Indeed, a State medical expert testified that he saw this provision as "a barn door" that provides "a large opening" for doctors to receive payment for abortions.[21]

I would accept the State's argument and, applying the doctrine of

---

[20] Op. at 11 and n.40 (quoting *Estate of Kim*, 295 P.3d at 388). The court acknowledges that "the statute's text is ambiguous." Op. at 14.

[21] Op. at 11-12 (emphasis added) (footnotes omitted).

constitutional avoidance, construe the statute just so, interpreting the statute, and particularly its catch-all provision, to broaden the scope of covered conditions and thereby avoid the constitutional impediment.[22]

The challenged regulation, 7 AAC 160.900(d)(30), is virtually identical to AS 47.07.068, except in its broader provision for mental health conditions. The regulation authorizes Medicaid coverage to "avoid a threat of serious risk to the physical health of the woman" due to "a psychiatric disorder that places the woman in imminent danger of medical impairment of a major bodily function if an abortion is not performed." The regulation thus covers not only psychiatric disorders that threaten a woman's life, like depression with suicidal ideation, but also psychiatric disorders that threaten the woman's physical health, such as anorexia or self-neglect caused by depression or other mental illnesses, if the physician believes an abortion is needed to avoid these harms.[23]

---

[22]     This is what the sponsor of the bill intended. I give one example. The court states that "[t]he statute also does not cover abortions when the fetus suffers from a fatal anomaly . . . . The text does not leave room to consider an abortion medically necessary based on the suffering of the fetus. The bill's sponsor indicated that he believed fatal fetal abnormalities would be covered under the bill's catch-all provision." Op. at 25 (citing letter from Senator John Coghill to Senate Finance Committee Members (Apr. 1, 2013), http://www.akleg.gov/basis/Bill/Detail/28?Root=SB%20%2049#tab5_4). "But," the court continues, "this statement, unsupported by other evidence from the legislative history, is not sufficient to overcome the plain meaning of the statute." Op. at 25. Under the doctrine of constitutional avoidance and as a matter of respect for the legislature, I would accept this clear and significant item of legislative history — it is the statement of intent and understanding by the bill's *sponsor*, after all — as a sufficient basis to broadly interpret the catch-all provision as the bill's sponsor understood and intended it.

[23]     Medicaid generally does not cover treatment sought solely to alleviate distress caused by life's circumstances, short of actual diagnosed mental disorders. Medicaid is limited to providing care that protects basic health and does not provide all care that would optimize physical or mental well-being. *See* 7 AAC 105.110(1) (services not eligible for Medicaid coverage if "not reasonably necessary for the diagnosis and (continued...)

To conclude, I believe that AS 47.07.068 and AAC 160.990(d)(30) can and should be interpreted broadly as the State argues to obviate the constitutional infirmities that this court's rigid construction finds. I believe that the legislature can constitutionally determine as a matter of state policy what is "medically necessary" for purposes of expenditure of limited state dollars to fund Medicaid abortions. I believe the court today fails to give respect to the legislature's proper role but instead substitutes its judgment for that of the legislature. Finally, nothing in Alaska's equal protection clause requires the State to subsidize non-medically-necessary abortions for Medicaid-eligible women simply because it provides them with medically necessary healthcare. I respectfully dissent.

---

**23** (...continued)
treatment of an illness or injury, or for the correction of an organic system"). A mental health condition is grounds for coverage only if it poses a risk to the woman's life or physical health. The evidence at trial showed that no published studies indicate that abortion is effective as *treatment* for mental disorders triggered or exacerbated by pregnancy, nor that it is endorsed as such by professional medical societies. Planned Parenthood's own witnesses appear to agree. Dr. Bibeault, a perinatal psychiatrist, was not aware of any studies that identify abortion as a treatment for perinatal mental illness. Dr. Meltzer-Brody, also a perinatal psychiatrist, was not aware of any such studies either, nor had she discussed abortion as a treatment in her own published work on perinatal depression. Dr. Meltzer-Brody also conceded that the medical profession does not view abortion as an approach to treating mental disorders: "I don't think abortion is ever discussed as a treatment in the same way we consider medication treatment or psychotherapies . . . . I think that's because the medical profession sees ending a pregnancy as a very serious decision, but I don't think it's bandied about as considered treatment."