*Notice: This order is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, DEPARTMENT OF EDUCATION & EARLY DEVELOPMENT, and DEENA M. BISHOP, in an official capacity, | ) ) ) ) ) ) |
| | ) |
| Appellants, | ) |
| and | ) ) |
| ANDREA MOCERI, THERESA BROOKS, and BRANDY PENNINGTON, | ) ) ) ) |
| | ) |
| Intervenors-Appellants, | ) |
| v. | ) ) |
| EDWARD ALEXANDER, JOSH ANDREWS, SHELBY BECK ANDREWS, and CAREY CARPENTER, | ) ) ) ) ) |
| | ) |
| Appellees. | ) |
| | ) |

Supreme Court Nos. S-19083/19113 (Consolidated)

Superior Court No. 3AN-23-04309 CI

O P I N I O N

No. 7759 – March 28, 2025

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Margaret Paton Walsh, Chief Assistant Attorney General, Anchorage, Treg Taylor, Attorney General, Juneau, Elbert Lin, Hunton Andrews Kurth LLP, Richmond, Virginia, and Lea E. Patterson, Justin E. Butterfield, and Hiram S. Sasser, First Liberty Institute,

Plano, Texas, for Appellants. Craig Richards, Law Office of Craig Richards, Anchorage, Jeff Rowes, Institute for Justice, Austin, Texas, and David Hodges and Kirby Thomas West, Institute for Justice, Arlington, Virginia, for Intervenors-Appellants. Scott M. Kendall and Lauren L. Sherman, Cashion Gilmore & Lindemuth, Anchorage, for Appellees. Jonathan W. Katchen, William G. Cason, and William R. Crowther, Holland & Hart LLP, Anchorage, for Amicus Curiae Matanuska-Susitna Borough School District. Matthew T. Findley, Ashburn & Mason, P.C., Anchorage, for Amicus Curiae Carlene Boden.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices, and Winfree, Senior Justice.[*] [Carney, Justice, not participating]

BORGHESAN, Justice.

## I. INTRODUCTION

Alaska statutes permit local school districts to operate correspondence study programs as an alternative to traditional schooling. The statutes also permit such school districts to offer an allotment of public funds for each correspondence student to be spent on educational expenses. Allotment funds may be used to purchase nonsectarian educational services and materials from public, private, or religious organizations in connection with a course of study approved by the school district.

Parents of students enrolled in public schools sued the State, contending that the statutes authorizing these allotments violate article VII, section 1 of the Alaska Constitution, which prohibits using "public funds for the direct benefit of any religious or other private educational institution." The parents argued that the statutes were facially unconstitutional and should be invalidated entirely because the statutes were intended to allow, and were actually allowing, school districts to provide parents and

---

[*] Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

guardians with allotments to pay for their children's tuition at private schools. Alternatively, the parents argued that the statutes were unconstitutional when applied to allow public funds to be used for private school tuition, so judgment should be entered prohibiting that practice.

The superior court ruled that the statutes were facially unconstitutional and invalidated them entirely. The court did not reach the narrower question of whether the statutes were unconstitutional when applied to allow public funds to be used for private school tuition. The decision was appealed to us. Because uncertainty about the status of the correspondence study program created hardships for families, educators, and businesses, we expedited the appeal. We issued a summary order vacating the superior court's judgment and sending the case back for further proceedings. This opinion explains the basis for our earlier order.

The superior court's ruling effectively prevented students from using allotment funds for any purpose. That remedy went too far. It is clear that there are a substantial number of constitutionally valid uses of allotment funds. Even if using allotment funds to pay private school tuition were unconstitutional — a question we do not answer today — that would not justify precluding every use of allotment funds. Striking down the statutes entirely was legal error.

There remains the important question whether it is constitutional to use allotment funds to pay for private school tuition. But we decline to decide this question now for two reasons. First, it is unclear whether the statutes actually permit this use of allotment funds. The issue was argued to but not decided by the superior court, and the parties did not brief the issue to us. Second, the school districts that allegedly approved this use of allotment funds were not made parties to the lawsuit. We cannot decide whether a government action violates the constitution unless the government entity taking the action is properly before the court.

For these reasons, this case must go back to the superior court. The proper parties must be joined. And the superior court must interpret the statutes to determine

if they allow allotment funds to be used for private school tuition before addressing the statutes' constitutionality.

## II.    FACTS AND PROCEEDINGS

### A.    Correspondence Study Programs Prior To 2014

Public schooling in Alaska has, for decades, included correspondence study. The Department of Education and Early Development (the Department) has long had authority to "exercise general supervision over elementary and secondary correspondence study programs offered by municipal school districts or regional educational attendance areas."[1] The Department also may "offer and make available to any Alaskan through a centralized office a correspondence study program."[2] In 2002 the Legislature amended the statute governing school districts' textbook selection to apply to "a district-offered statewide correspondence study program" and to emphasize that correspondence students were not precluded from "privately obtaining or using textbooks or curriculum material not provided by the school district."[3]

Before 2015 correspondence study programs were operated under regulations enacted by the Department.[4] These regulations detailed requirements for "individual learning plans" (ILPs), including ongoing monitoring by a certificated

---

[1]    AS 14.07.020(a)(9); *compare* Ch. 190, § 1, SLA 1975 ("The department shall . . . provide accredited elementary and secondary correspondence study programs available to any Alaskan through a centralized office of correspondence study."), *with* Ch. 114, § 2, SLA 2003, amending AS 14.07.020(a)(9) ("The department shall . . . exercise general supervision over elementary and secondary correspondence study programs offered by municipal school districts or regional educational areas; the department may also offer and make available to any Alaskan through a centralized office a correspondence study program.").

[2]    AS 14.07.020(a)(9).

[3]    Ch. 130, § 1, SLA 2002, amending AS 14.07.050.

[4]    *See* former 4 Alaska Administrative Code (AAC) 33.421 (2014), *repealed* 4 AAC Register 213 (Mar. 6, 2015).

teacher; "a grade, or some other determination that the student has met the standards for a course;" and an academic transcript.[5]  The regulations required "at least monthly teacher-student or teacher-parent contact and quarterly reviews of the student's work or progress."[6]

These regulations also authorized an allotment of public funds to a student's family to cover educational expenses.[7]  But allotment restrictions barred spending on "family travel," "annual passes or family memberships to a sports or recreational facility," fees for facilities where students were not receiving instruction "directly connected" to an ILP, "religious, partisan, sectarian, or denominational textbooks or other curriculum materials," and "items that [were] considered excessive by the school administrator."[8]

The regulations also authorized a correspondence study program "or a parent through a fund account" to contract with private individuals tutoring in a core subject such as "fine arts, music, or physical education."[9]  But this instruction could not be provided "by a private or sectarian educational institution."[10]  And the certificated teacher bore "the primary responsibility to plan, instruct, and evaluate the learning of the student in the subject."[11]

---

[5]     *See* former 4 AAC 33.421(d)(1)-(6) (2014).

[6]     Former 4 AAC 33.421(d)(3) (2014).

[7]     *See* former 4 AAC 33.422(a) (2014).

[8]     *Id.*

[9]     *See* former 4 AAC 33.421(h) (2014).

[10]    Former 4 AAC 33.421(h)(1) (2014).

[11]    Former 4 AAC 33.421(h)(3) (2014).

**B.** **Enactment Of Statutes Governing Correspondence Study And Allotments (AS 14.03.300-14.03.310)**

In 2013 legislation was introduced to codify the framework for correspondence study.[12] Among other things, the legislation sought to allow parents to use an allotment of public funds to purchase services and materials from "private or religious organization[s]" to meet the student's instructional needs.[13]

This legislation was paired with a resolution to amend the constitutional provision limiting the use of public funds at private and religious educational institutions.[14] The resolution sought to remove the last sentence of article VII, section 1 of the Alaska Constitution,[15] which provides: "No money shall be paid from public funds for the direct benefit of any religious or other private educational institution." The resolution sought to replace that prohibition with the following statement: "However, nothing in this section shall prevent payments from public funds for the direct educational benefit of students as provided by law."[16]

Neither the proposed correspondence study bill nor the resolution came to a vote. But in 2014 the language from the correspondence study legislation was inserted

---

[12] *See* Minutes, S. Educ. Standing Comm. Hearing on S.B. 100, 28th Leg. 1st Sess., 8:29:15-8:42:36 (Apr. 10, 2013) (statement of sponsor Sen. Mike Dunleavy).

[13] Minutes, S. Educ. Standing Comm. On S.B. 100, 28th Leg., 1st Sess. (March 2, 2014) (statement of sponsor Sen. Mike Dunleavy).

[14] Minutes, S. Jud. Standing Comm. Hearing on S.J.R. 9, 28th Leg., 1st Sess. 1:38:37-1:41:39 (Mar. 15, 2013) (statement of Sen. Mike Dunleavy); *see* Minutes, S. Educ. Standing Comm. Hearing on S.B. 100, 28th Leg. 1st Sess., 8:29:20-8:34:59 (Apr. 10, 2013) (statement of sponsor Sen. Mike Dunleavy) (explaining correspondence school legislation was "companion" bill to resolution to amend constitution).

[15] Minutes, S. Jud. Standing Comm. Hearing on S.J.R. 9, 28th Leg., 1st Sess. 1:41:39-1:44:10 (Mar. 15, 2013) (statement of sponsor Sen. Mike Dunleavy).

[16] *Id.*

in an omnibus education spending bill that became law.[17]  The provisions for correspondence study and allotments were codified at AS 14.03.300 (the ILP statute) and AS 14.03.310 (the allotment statute), respectively.  The enacted legislation did not include language from the resolution to amend the constitution.[18]

The ILP statute requires that an ILP curriculum meet certain standards.  For example, each correspondence student shall receive an ILP developed in collaboration with the student, the student's parents, and a certificated teacher.[19]  The ILP must provide for a course of study consistent with district standards, include monitoring and required statewide assessments, and allow for modification if the student is less than proficient in a core subject.[20]  The statute prohibits the Department from imposing additional requirements on a correspondence student who scores proficiently on statewide assessments.[21]

The allotment statute authorizes a stipend for each student enrolled in correspondence schooling.  Under this statute the Department or a school district may offer an allotment to correspondence students' parents "for the purpose of meeting instructional expenses."[22]  Parents may use this allotment to purchase "nonsectarian services and materials from a public, private, or religious organization" so long as the

---

[17]     *Compare* Ch. 15, § 15, SLA 2014, *with* S.B. 100, Draft G, 28th Leg., 2d Sess. (Mar. 14, 2014).

[18]     *See* Ch. 15, § 15, SLA 2014.

[19]     AS 14.03.300(a).

[20]     AS 14.03.300(a)(1)-(6).

[21]     AS 14.03.300(b) ("Notwithstanding another provision of law, the department may not impose additional requirements, other than the requirements specified under (a) of this section and under AS 14.03.310, on a student who is proficient or advanced on statewide assessments required under AS 14.03.123(f).").

[22]     AS 14.03.310(a).

expenses are required for the student's ILP and meet certain other criteria.[23] A school district providing allotments must "maintain a record of expenditures and allotments" and "implement a routine monitoring of audits and expenditures."[24]

In 2015 the Department revised its regulations to implement these statutes.[25] The new regulations omitted the list of expenses previously prohibited.[26] Instead, the new regulations required expenses to "reasonably relate to the delivery of the students' instructional needs" and be approved by a certificated teacher or the correspondence program's director.[27] The new regulations continued to provide monitoring of each student by a certificated teacher.[28] But unlike the older regulations, the revised regulations required monthly contact with a certificated teacher only for students who scored below proficient on statewide assessments.[29]

### C. Proceedings In This Case

In January 2023 four parents of children enrolled in public schools — Edward Alexander, Josh Andrews, Shelby Beck Andrews, and Carey Carpenter (collectively Alexander) — filed suit against the Department, challenging the constitutionality of the ILP and allotment statutes. Referencing recent media reports, the complaint alleged that students enrolled in correspondence study programs operated by the Anchorage School District and Matanuska-Susitna (Mat-Su) Borough School District had been authorized to use allotment funds to pay for classes and tuition at

---

[23] AS 14.03.310(b).

[24] AS 14.03.310(d)(3)-(4).

[25] *See* former 4 AAC 33.421 (2015).

[26] *Compare* former 4 AAC 33.421(g) (2014), *with* former 4 AAC 33.421(h) (2015).

[27] Former 4 AAC 33.421(h) (2015).

[28] Former 4 AAC 33.421(a)(1) (2015).

[29] *Compare* former 4 AAC 33.421(d)(3) (2014), *with* former 4 AAC 33.421(a)(1) (2015), *amended* 4 AAC Register 218 (Apr. 6, 2016).

private schools. Alexander argued that such uses of allotment funds violated article VII, section 1's prohibition against direct benefits to religious and private educational institutions. Alexander asked the court to issue an order declaring both statutes facially unconstitutional or, in the alternative, unconstitutional as applied to pay for private school classes or tuition.

Three parents intervened as defendants: Andrea Moceri, Theresa Brooks, and Brandy Pennington (collectively Moceri). These parents received allotments during the 2022-23 school year and spent them on their children's tuition at private Catholic schools.

The Department moved to dismiss the complaint,[30] arguing that the statutes were not facially unconstitutional. It recognized some uncertainty in case law about the standard for declaring a statute unconstitutional on its face. But it argued that the statutes were constitutional even under the less stringent standard — whether the statute has a "plainly legitimate sweep" despite "occasional problems it might create in its application to specific cases"[31] — because they authorized many valid uses of allotment funds. The Department acknowledged that using allotment funds to pay for full-time enrollment in private schools might violate the constitution. But it pointed out that the statutes may not actually permit this use of allotment funds. It also described a number of possible uses of allotment funds that did not entail paying private school tuition. Therefore, it argued, the statutes had a plainly legitimate sweep "even if some possible applications — like using the funds to pay full-time private school tuition — are unconstitutional."

The Department also argued that Alexander's as-applied challenge to the statutes could not go forward without joining individual school districts as necessary

---

[30] Alaska R. Civ. P. 12(b)(6) (permitting motion to dismiss complaint for "failure to state a claim upon which relief can be granted").

[31] *Treacy v. Mun. of Anchorage*, 91 P.3d 252, 268 (Alaska 2004).

parties to the litigation. The Department explained that it did not approve individual uses of allotment funds; rather, individual school districts operating correspondence study programs approved particular uses of allotment funds in connection with a student's ILP. Therefore, the Department argued, it would not be proper to decide the constitutionality of particular uses of allotment funds unless a school district that had authorized such uses were made a party to the litigation.[32]

Alexander opposed the Department's motion to dismiss and moved for summary judgment.[33] He argued that both the ILP and allotment statutes lacked a plainly legitimate sweep because the Legislature had specifically intended them to serve an unconstitutional purpose — to enable parents to spend public funds for their children to attend private and religious schools. He further contended that the ILP statute impermissibly restricted the Department's supervisory role over allotment spending.[34] Alexander's arguments relied heavily on statements by the bill's sponsor and the fact that the legislation that became the ILP and allotment statutes initially was paired with a constitutional amendment that later failed in committee. Alexander asked the court to strike down both statutes in their entirety. He maintained that the statutes could not be partially invalidated or narrowly interpreted because they "expressly authorize

---

[32] *See* Alaska R. Civ. P. 19(a) ("A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . in the person's absence complete relief cannot be accorded among those already parties . . . . If the person has not been joined, the court shall order that the person be made a party.").

[33] Alaska R. Civ. P. 56(c) (authorizing court to enter summary judgment when there is no genuine issue of material fact in dispute and moving party is entitled to judgment as a matter of law).

[34] Alexander cited AS 14.03.300(b), providing that "[n]otwithstanding another provision of law, the [D]epartment may not impose additional requirements, other than the requirements specified under (a) of this section and under AS 14.03.310, on a student who is proficient or advanced on statewide assessment required under AS 14.03.123(f)."

public funds to be paid to private institutions, and specifically preclude the Department from narrowing this authorization."

The Department responded by filing its own cross-motion for summary judgment, reiterating its prior arguments and presenting new evidence. It argued that the terms in the allotment statute — "public, private, or religious *organization*"[35] — were "meaningfully different" from the constitution's prohibition of payments to "any religious or other private *educational institution*."[36] It maintained that many private "organizations," like bookstores and tutoring companies, were not "educational institutions" for purposes of the constitutional prohibition. It also observed that the statute allowed allotment funds to be used for classes at the University of Alaska, a public educational institution. To illustrate the kinds of organizations eligible for allotment funds, the Department attached a list of curricula and vendors approved for use in a correspondence study program operated by the Mat-Su Borough School District.

The Department conceded that allowing parents to spend allotment funds on full-time private school tuition "could violate Article VII, Section 1," but it maintained that the allotment statute did not allow funds to be used this way. Acknowledging that a correspondence study program's ILP "could be layered over a full-time private school education," the Department maintained that "this [was] clearly not the intent of the statute, which plainly contemplates an *individualized* plan for a student educated primarily through correspondence courses."

Responding to Alexander's arguments about state supervision of correspondence programs, the Department maintained that it had regulatory authority

---

[35]    AS 14.03.310(b) (emphasis added).

[36]    Alaska Const. art. VII, § 1 (emphasis added).

to ensure local school districts' compliance with the law.[37] It also reiterated its argument that the school districts were necessary parties to the as-applied challenge. It pointed out that the Department was not operating a statewide correspondence study program, so the only entities directly authorizing uses of allotment funds were local school districts.

Moceri also opposed Alexander's motion for summary judgment. Noting that the Alaska Constitution prohibits "direct" benefits to private educational institutions, she argued that using allotment funds for private school tuition is permissible because it directly benefits only parents and students; the benefit to private educational institutions, she argued, is indirect. She also argued that holding otherwise would violate the First and Fourteenth Amendments of the United States Constitution by (1) violating parents' fundamental right to enroll their children in private school; (2) discriminating against parents of private school students; and (3) burdening the "hybrid rights" of parents who choose religious schools for their children.[38]

The superior court denied the Department's motion to dismiss. It concluded that complete relief could be afforded without joining the school districts and that therefore they were not necessary parties.

---

[37] *See* 4 AAC 33.420 ("Each school district offering a correspondence study program must provide the department with a statement of assurance that it will comply with 4 AAC 33.405–4 AAC 33.490."); *see also* 4 AAC 33.460(a) ("The department may monitor correspondence study programs to ensure compliance with the requirements of 4 AAC 33.405–4 AAC 33.490."); 4 AAC 33.460(c) ("The department may place a district on a plan of correction for any violation of 4 AAC 33.405–4 AAC 33.490 . . . .").

[38] *See Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 881-82 (1990) (suggesting U.S. Supreme Court applies more stringent constitutional review in "hybrid situation" when "neutral, generally applicable law" burdens First Amendment right to free exercise of religion "in conjunction with other constitutional protections, such as freedom of speech and of the press, . . . or the rights of parents").

The court then granted Alexander's motion for summary judgment.  It agreed with Alexander that both the ILP and allotment statutes were facially unconstitutional.  The court reasoned that legislative history showed these statutes were "drafted for the specific purpose of allowing purchases of private educational services with the public correspondence student allotments."  It rejected the Department's argument that the allotment statute's category of private or religious "organizations" at which allotment funds could be used was meaningfully distinct from the category of "religious or other private educational institution[s]" described in article VII, section 1.  The court also reasoned that the Department "mischaracterize[d] the 'plainly legitimate sweep' standard by relying on an occasional constitutional use to save a plainly unconstitutional statute."

Finally, the court concluded that the statutes could not be saved by construing them narrowly or severing portions.  It observed that the Department "[did] not ask the Court to craft a narrowing construction to sever any provisions."  And it concluded that "there is no workable way to construe the statutes to allow only constitutional spending."  Consequently, it struck down both statutes in their entirety.

Both Alexander and the Department moved to stay the court's order.  Alexander sought to stay the order until the end of the fiscal year on June 30, 2024.  The Department sought to stay the order while an appeal to our court was pending.  The Department asserted that a longer stay was needed because the court's ruling had disrupted educational plans for many students.  The superior court granted Alexander's requested stay and denied the Department's.  Responding to the Department's assertion, the court stated that the Department had mischaracterized the scope of its order.  The court noted that it had not found correspondence study programs unconstitutional and

stated that "correspondence programs continue to exist after this Court's order."[39]  But the court reiterated its conclusion that the allotment statute was unconstitutional and that the ILP statute had to be struck down too because, in the court's view, it did not permit the Department to prevent unconstitutional spending by school districts.

The Department and Moceri appealed.[40]  Following the superior court's ruling, the Legislature enacted new legislation authorizing allotments for correspondence study.[41]  This legislation did not repeal the statutes that were struck down by the superior court; rather, the new legislation operates "notwithstanding" AS 14.03.300 and AS 14.03.310.[42]  The new legislation expires July 1, 2025.[43]

---

[39]     The court cited statutes and regulations pertaining to correspondence education:  AS 14.03.095(a) (permitting correspondence student to enroll as part-time student in district); AS 14.07.050, AS 14.08.111, and AS 14.14.090(7) (providing that correspondence study student may privately obtain or use "textbooks or curriculum material not provided by the school district"); AS 14.17.410(b) (noting public school funding calculations, including for correspondence study programs); AS 14.17.500(c) (providing student count calculation for correspondence student); AS 14.30.010(b)(10) (excluding correspondence student from compulsory attendance requirement); AS 14.30.186(a)(5) (requiring school district operating statewide correspondence study program to provide special education); AS 14.30.365(c)(1) and AS 14.45.150(c)(1) (classifying statewide correspondence school as "alternative education program").

[40]     Amicus briefs were filed by Mat-Su Borough School District and Carlene Boden, the parent of a correspondence student with special needs.  We thank both amici curiae for their helpful briefing in this case.

[41]     Ch. 47, § 5, SLA 2024 (authorizing allotments "only for implementation of student's individual learning plan" and requiring Department to adopt regulations consistent with art. VII, § 1 of Alaska Constitution) (uncodified law of the State of Alaska).

[42]     *Id.*

[43]     Ch. 47, § 6, SLA 2024 (sunsetting legislation July 1, 2025) (uncodified law of the State of Alaska); *see* Minutes, S. Ed. Comm. Hearing on S.B. 266, 33rd Leg., 2nd Sess., 03:41:20-03:41:25 (May 08, 2024) (statement of Michael Mason, Staff to Sen. Löki Tobin).

We expedited the appeal, heard oral argument, and issued a summary ruling reversing the superior court's judgment. We now explain our ruling in more detail.

## III. STANDARD OF REVIEW

"We review summary judgment rulings and questions of constitutional and statutory interpretation, including the constitutionality of a statute, de novo."[44] "We interpret the constitution and Alaska law according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[45] Duly enacted statutes are "presumed to be constitutional."[46]

The Department asks us to reverse the superior court's ruling that Alexander may proceed with his as-applied challenge to the constitutionality of the allotment and correspondence statutes without joining any local school districts as parties to the litigation.[47] "Although we ordinarily review the decision whether someone is an indispensable party for an abuse of discretion, the decision in this case depends upon the interpretation of a statute, which we decide de novo."[48]

---

[44]   *Kohlhaas v. State*, 518 P.3d 1095, 1103 (Alaska 2022).

[45]   *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

[46]   *Treacy v. Mun. of Anchorage*, 91 P.3d 252, 260 (Alaska 2004).

[47]   *See* Alaska R. Civ. P. 19(a) ("A person . . . shall be joined as a party in the action if . . . in the person's absence complete relief cannot be accorded among those already parties . . . .").

[48]   *Pouzanova v. Morton*, 327 P.3d 865, 867 (Alaska 2014).

## IV. DISCUSSION

### A. It Was Error To Rule The Allotment And ILP Statutes Facially Unconstitutional.

#### 1. A statute is not facially unconstitutional unless, at minimum, it lacks a plainly legitimate sweep.

"Under Alaska's constitutional structure of government, 'the judicial branch . . . has the constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution, including compliance by the [L]egislature.' "[49] We have "not only the power but the duty" to strike down laws that violate our constitution.[50] While carrying out this duty, however, we must be careful not to go further than necessary,[51] "keep[ing] in mind that 'a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' "[52]

Special care must be taken when choosing a remedy for an unconstitutional statute. Courts may find statutes "unconstitutional as applied or unconstitutional on their face."[53] Ruling a statute facially unconstitutional strikes the statute down in full.[54] Ruling a statute unconstitutional as applied "simply means that

---

[49]   *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 913 (Alaska 2001) (quoting *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982)).

[50]   *Id.*

[51]   *Cf. Treacy*, 91 P.3d at 260 ("Courts should construe enactments to avoid a finding of unconstitutionality to the extent possible. This is particularly so in a case like this: a facial challenge as opposed to a challenge to the ordinance as applied.").

[52]   *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006)).

[53]   *State v. Am. Civil Liberties Union (ACLU) of Alaska*, 204 P.3d 364, 372 (Alaska 2009).

[54]   *See State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 1000 (Alaska 2019) (describing facial challenge to statute and regulation as "seeking to invalidate them *in toto*, as enacted").

under the facts of the case application of the statute is unconstitutional."[55]  Under other circumstances, however, the statute may be applied constitutionally.[56]

The United States Supreme Court has explained why "[f]acial challenges are disfavored."[57]  They "often rest on speculation."[58]  They "run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' "[59]  And they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."[60]  For these reasons, "[a]s-applied challenges are the basic building blocks of constitutional adjudication."[61]

There is a high bar for declaring a statute facially unconstitutional, although we have not always been consistent when describing precisely what the bar is. At times we have explained that we will uphold a statute against a facial challenge, even if the statute may present constitutional problems in some applications, so long as it "has a plainly legitimate sweep."[62]  At other times we have stated that a facial challenge

---

[55]  *ACLU of Alaska*, 204 P.3d at 372.

[56]  *See id.*

[57]  *Wash. State Grange*, 552 U.S. at 450.

[58]  *Id.*

[59]  *Id.* (quoting *Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring)).

[60]  *Id.*

[61]  *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) (quoting Richard H. Fallon, Jr., *As-Applied & Facial Challenges & Third-Party Standing*, 133 HARV. L. REV. 1321, 1328 (2000)).

[62]  *State v. Planned Parenthood of Alaska*, 171 P.3d 577, 581 (Alaska 2007) (quoting *Treacy v. Mun. of Anchorage*, 91 P.3d 252, 260 n.14 (Alaska 2004)).

will not be successful unless "there is no set of circumstances under which the statute can be applied consistent with the requirements of the constitution."[63]  We need not resolve this tension because Alexander's claim fails to clear even the lower bar: demonstrating that the statute lacks a plainly legitimate sweep.

A statute has a plainly legitimate sweep if it has a substantial number of constitutional applications, even if other applications are unconstitutional.  We first invoked the "plainly legitimate sweep" standard in *Treacy v. Municipality of Anchorage*, citing Justice John Paul Stevens's dissent in *Troxel v. Granville*.[64]  In that dissent Justice Stevens reasoned that the challenged statute was not facially unconstitutional because it "plainly swe[pt] in a great deal of the permissible."[65]  We acted consistently with this approach in *Treacy*, upholding a municipal curfew ordinance against facial challenge because it had a clear connection to the city's interest in child welfare.[66]  We recognized that the ordinance could be enforced in ways unduly restrictive of constitutional liberties but reasoned that these possibilities did not make the statute facially unconstitutional.[67]

---

[63]     *State v. Am. Civil Liberties Union (ACLU) of Alaska*, 204 P.3d 364, 372 (Alaska 2009).

[64]     91 P.3d 252, 268 (Alaska 2004) (quoting *Troxel v. Granville*, 530 U.S. 57, 85 (2000) (Stevens, J., dissenting)).

[65]     *Troxel*, 530 U.S. at 85 & n.6 (Stevens, J., dissenting) (distinguishing "plainly legitimate sweep" test from the "more stringent demands" of the "no set of circumstances" test).

[66]     91 P.3d at 268.  We acknowledged that in previous cases we had employed both the more stringent "no set of circumstances" test as well as the "relaxed" "plainly legitimate sweep" test but assumed, for purposes of that opinion, that the latter test applied.  *Id.* at 260 n.14 (citing *State v. Planned Parenthood of Alaska*, 35 P.3d 30, 35 (Alaska 2001)).

[67]     *Id.* at 268 (citing *State, Dep't of Revenue, Child Support Enf't Div. v. Beans*, 965 P.2d 725, 728 (Alaska 1998) (reasoning that statute was not facially unconstitutional because State had discretion to apply it in lawful ways)).

Alexander argues that a statute may be declared facially unconstitutional with a lesser showing: whenever it violates the "minimum requirements" of the Alaska Constitution, such as by "authorizing action in violation of 'a constitutional prohibition.' " But a plaintiff must do more than show that a statute authorizes some unconstitutional action to have the statute enjoined in its entirety.

The cases that Alexander cites — *Owsichek v. State, Guide Licensing & Control Board*,[68] *Forrer v. State*,[69] and *State v. Alex*[70] — do not support his description of the facial challenge standard. In those cases the challenged statutes violated the constitution in *every* application.

For example, in *Owsichek* we considered a constitutional challenge to a statute authorizing the creation of "exclusive guide areas," geographic areas in which only a single hunting guide chosen by the State could guide hunts.[71] Because an exclusive guide area was precisely the kind of "monopolistic grant" or "special privilege" prohibited by article VIII of the Alaska Constitution, we ruled the statute unconstitutional on its face.[72] The statute was facially unconstitutional because the benefit it created was *always* unconstitutional. By contrast, giving families of correspondence students money to pay for educational expenses is not always, or even usually, unconstitutional.

Similarly, in *Forrer* we held that legislation authorizing a particular type of bond violated the constitutional prohibition on incurring state debt without public

---

[68]     763 P.2d 488 (Alaska 1988).

[69]     471 P.3d 569 (Alaska 2020).

[70]     646 P.2d 203 (Alaska 1982).

[71]     *Owsichek*, 763 P.2d at 488-89.

[72]     *Id.* at 496-98.

approval.[73]   And in *Alex* we held that a statute authorizing private aquaculture associations to collect assessments on salmon sales by commercial fishers, with proceeds to be used to fund the associations' activities, violated the constitutional prohibition on dedication of revenues.[74]  In each of those cases, the action authorized by statute was always unconstitutional.  Not so here:  Alexander concedes that not all uses of allotment funds involve a direct benefit to religious or private educational institutions.  The *Forrer*  and *Alex* decisions are not on point.

Therefore, to prevail on the claim that the allotment and ILP statutes are facially unconstitutional, Alexander must show that they do not "plainly sweep in a great deal of the permissible."[75]

### 2. The allotment and ILP statutes are not facially unconstitutional because they have a plainly legitimate sweep.

#### a. Allotment funds can be used in a substantial number of ways that do not entail unconstitutional direct benefits to religious or private educational institutions.

To decide whether the allotment and ILP statutes lack a plainly legitimate sweep, we interpret the constitution's prohibition against using "public funds for the direct benefit of any religious or other private educational institution"[76] and compare it to the range of uses for allotment funds that these statutes permit.

---

[73]   *Forrer*, 471 P.3d at 572-73; *see* Alaska Const. art. IX, § 8 ("No state debt shall be contracted unless authorized by law for capital improvements or unless authorized by law for housing loans for veterans, and ratified by a majority of the qualified voters of the State who vote on the question.").

[74]   *Alex*, 646 P.2d at 210; Alaska Const. art. IX, § 7 ("The proceeds of any state tax or license shall not be dedicated to any special purpose . . . .").

[75]   *Troxel v. Granville*, 530 U.S. 57, 85 (2000) (Stevens, J., dissenting) (*cited in Treacy v. Mun. of Anchorage*, 91 P.3d 252, 260 n.14 (Alaska 2004)).

[76]   Alaska Const. art. VII, § 1.

"Our analysis of a constitutional provision begins with, and remains grounded in, the words of the provision itself."[77] "Constitutional provisions should be given a reasonable and practical interpretation in accordance with common sense."[78] "[We] . . . look to the plain meaning and purpose of the provision and the intent of the framers."[79] "Legislative history and the historical context, including events preceding ratification, help define the constitution."[80]

Article VII, section 1 of the Alaska Constitution provides:

> The legislature shall by general law establish and maintain a system of public schools, open to all children of the State, and may provide for other public educational institutions. Schools and institutions so established shall be free from sectarian control. No money shall be paid from public funds for the direct benefit of any religious or other private educational institution.

Beginning with the text, we note two key elements of article VII, section 1's prohibition: it applies to "any religious or other private *educational institution*"; and it prohibits using public funds for the "*direct* benefit" of such institutions.[81] These key terms are essential to understanding what the constitution prohibits.

The term "educational institution" clearly includes schools, but its plain meaning does not include every entity that provides some kind of service related to

---

[77]     *State v. Alaska Legis. Council*, 515 P.3d 117, 123 (Alaska 2022) (quoting *Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017)).

[78]     *Id.* (quoting *Hickel v. Cowper*, 874 P.2d 922, 926 (Alaska 1994)).

[79]     *Id.*

[80]     *Wielechowski*, 403 P.3d at 1147 (quoting *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016)).

[81]     Alaska Const. art. VII, § 1 (emphasis added).

education, such as a bookstore.[82] The constitutional convention proceedings do not suggest such a broad interpretation either. When Delegate R. Roland Armstrong of Juneau introduced the proposal that became article VII, section 1 to the constitutional convention delegates, he explained that the drafting committee "ha[d] spelled out the fact that all children shall have the opportunity of schools, and that if the need arises for vocational schools, rehabilitation centers, schools for the [disabled] and other forms of education, that is completely possible under this proposal."[83] This explanation suggests that the term "educational institutions" was meant to include institutions comparable to schools but for specific populations or purposes. Alexander does not point to, and we have not found, convention debates suggesting that the "no direct benefit" clause was meant to prohibit, for example, using state funds for the purchase of books or supplies from private vendors. The delegates' debates suggest the contrary, as we explain below.

The superior court rejected the argument that the constitutional term "religious or other private educational institution" was meaningfully different from the statutory provision for where allotment funds could be spent: a "public, private, or religious organization." But we perceive a meaningful difference between these categories. A private educational institution is a narrower category than a private organization. The former is akin to a school or college.[84] The latter includes all manner

---

[82]    *See Educational Institution*, BLACK'S LAW DICTIONARY (4th ed. 1951) ("A school, seminary, college, or educational establishment.").

[83]    2 Proceedings of the Alaska Constitutional Convention (PACC) 1514 (Jan. 9, 1956).

[84]    *See supra* note 82; see also *Educational*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1954) ("Of, pertaining to, engaged in, or subserving, education; dealing or associated with education; belonging to or applied to the field of education."); *Institution*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1954) ("An established society or corporation; an establishment, esp[ecially] one of public character.").

of private entities such as businesses and nonprofit corporations.[85]  The delegates'
consistent focus on private schools when debating the provision that became article VII,
section 1 reinforces the distinction between the category described in the constitution
and the category described in the allotment statute.[86]

The other key term is the constitution's prohibition on "direct" benefits.
The distinction between "direct" and "incidental" benefits "may at times appear more
metaphysical than precise."[87]  But the constitutional convention delegates debated this
distinction at length, and their discussion is illuminating.

The delegates clearly did not intend to adopt a maximalist prohibition.
The proposal that became article VII, section 1 was synthesized from two delegate
proposals,[88] one from Delegate Maurice Johnson of Fairbanks[89] and the other jointly
authored by Delegate Johnson and Delegate Jack Coghill of Nenana.[90]  The Johnson–
Coghill proposal would have provided:

> No public funds from whatever source, local or state, shall
> be used directly or indirectly for the support, operation or
> maintenance, including transportation and other auxiliary

---

[85]     *See Organization*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A body
of persons (such as a union or corporation) formed for a common purpose."); *see also
Organization*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH
LANGUAGE 1719 (2d ed. 1954) ("The executive structure of a business; the personnel
of management, with its several duties and places in administration; the various persons
who conduct a business, considered as a unit.").

[86]     *See* 2 PACC 1509-11 (Jan. 9, 1956).

[87]     *Sheldon Jackson Coll. v. State*, 599 P.2d 127, 129-30 (Alaska 1979)
(quoting LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 840 (1st ed. 1978)).

[88]     Alaska Constitutional Convention, Committee Proposal No. 7, Report of
the Committee on Preamble and Bill of Rights (Dec. 15, 1955); *see* 2 PACC 1517 (Jan.
9, 1956) (statement of Del. Dorothy J. Awes).

[89]     Maurice T. Johnson, Delegate Proposal No. 2 (Nov. 15, 1955).

[90]     Maurice T. Johnson & John B. Coghill, Delegate Proposal No. 6, § 7
(Nov. 17, 1955).

services, for any schools or children therein except those Public Schools under the exclusive supervision and direction of the state.[91]

But the Committee on Preamble and Bill of Rights rejected many aspects of this proposal and ultimately adopted a far simpler provision: "No money shall be paid from public funds for the direct benefit of any religious or other private institution."[92]

Early in the proceedings, the delegates amended the committee proposal by inserting the word "educational" before "institution."[93] When the committee proposal was introduced to the delegates, Delegate Coghill proposed expanding the prohibition to bar "indirect" benefits.[94] This proposed amendment sparked a debate in which delegates discussed some programs that they appeared to view as "indirect benefits" and other programs that they appeared to view as "direct" benefits to private educational institutions. We discuss a few examples.

There appears to have been little doubt that the "direct benefit" language would prohibit spending state funds to construct, maintain, and operate private schools. Delegate Armstrong explained that the committee had discussed "direct legislation for the building of a school or the maintenance of a private school," and that these examples

---

[91] *Id.* Delegate Coghill served at that time as president of the Association of Alaska School Boards, which had approved a set of "principles of education" to be incorporated in the constitution. *See* 2 PACC 1516 (Jan. 9, 1956). One priority was that the constitution "positively prohibit the use of public funds — either state or local for private, denominational or parochial schools," emphasizing that this limitation should be "so air-tight as to eliminate any possibility of the use of public funds by private schools or non-public schools for textbooks, transportation, school lunches or any other purpose whatsoever, regular, auxiliary or incidental." Letter from Don M. Dafoe, Comm'r of Educ., to the Alaska Constitutional Convention (Dec. 21, 1955), https://www.akleg.gov/pdf/billfiles/ConstitutionalConvention/Folder%20205.pdf.

[92] Alaska Constitutional Convention, Committee Proposal No. 7 (Dec. 15, 1955).

[93] 2 PACC 1511-12 (Jan. 9, 1956).

[94] 2 PACC 1513 (Jan. 9, 1956).

would be prohibited by the "direct benefit" language.[95]  At another point in the debate, Delegate Armstrong explained that "the maintenance and operation or other features of direct help would be prohibited."[96]

There was also some reference to scholarships.  Delegates Victor Fischer and Barrie M. White of Anchorage proposed striking the "no direct benefit" clause entirely, reasoning that the Establishment Clause[97] and Public Purpose Clause[98] were sufficient to accomplish the delegates' purpose.[99]  Delegate White argued that the delegates would be "better advised to stick to the broad outlines."[100]  He suggested that in the future the State "might wish to get involved in some sort of G.I. Bill of its own," implying the prohibition on direct benefits would bar such a program.[101]  He suggested, "Why not leave ourselves open?"[102]  Although there was little discussion on this point, Delegate White's reasoning seems to have been that the "direct benefit" language could prevent programs, such as scholarships or tuition grants, that subsidize the tuition of students at private educational institutions.

---

[95]  *Id.* at 1529.

[96]  *Id.* at 1514.

[97]  Alaska Const. art. I, § 4 ("No law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof.").

[98]  Alaska Const. art. IX, § 6 ("No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose.").

[99]  2 PACC 1526 (Jan. 9, 1956).

[100]  *Id.* at 1527.

[101]  *Id.*

[102]  *Id.*

Perhaps most relevant to this case, Delegate Yule Kilcher of Homer expressed his concern that the State would no longer be able to subsidize homeschooling if the "indirect" language were added.[103] Delegate Kilcher explained:

> I am a father of seven children, five of which have had the Calvert course for several years with good results.[104] I understand that the Calvert course could possibly be construed not to be available anymore either if indirect help were [impossible. The Calvert School is a private school.] The Territory pays it. [It's a private school. It's a recognized private school.] My children go to a private school, or most of them. The biggest ones [now] hike over the road, and the Territory pays an indirect system. It could possibly be construed to include [even such a system as] the Calvert course[s], which is a great problem in Alaska.[105]

Delegate Coghill attempted to assuage Delegate Kilcher's concerns. Delegate Coghill explained that he was "familiar with the Calvert course," which he described as "one of [the Territorial Department of Education's] recognized correspondence courses for the outlying areas."[106] Delegate Coghill stated, "If any family on a [Civil Aeronautics Authority] remote station or someone on a remote part of the Yukon River, etc., would want to further the education of their children, write to the Commissioner of Education and they are referred to the Calvert course."[107] This

---

[103]    *Id*. at 1524.

[104]    The "Calvert course" refers to a correspondence program (at the time, a mail-order course) offered by the Calvert School, a private school in Baltimore, since 1906. *See* Millicent Lawton, *Borrowing from the Basics*, EDUC. WEEK (Apr. 20, 1994), https://www.edweek.org/education/borrowing-from-the-basics/1994/04.

[105]    2 PACC 1524 (Jan. 9, 1956). At a handful of points, the transcript of the proceedings varies from Delegate Kilcher's remarks. This quote is from the transcript; the bracketed language reflects the portions of the audio recording that differ from the transcript.

[106]    2 PACC 1525 (Jan. 9, 1956).

[107]    *Id*.

exchange suggests the delegates did not intend to prohibit using state funds to purchase a homeschool curriculum from a private organization — perhaps even from a private school.[108]

Finally, the debates make clear that the "direct benefit" prohibition was not intended to prohibit the "contracting or giving of services to the individual child," such as health and welfare programs operated by or delivered through schools.[109] Speaking against Delegate Coghill's proposal to expand the constitutional prohibition to "indirect benefits," Delegate Dorothy Awes of Anchorage expressed concern that this proposal would "make it impossible to give any of these welfare benefits, for instance, to children who were in private schools, and [the Committee] did not feel that any prohibition should go that far."[110] Delegate Seaborn J. Buckalew of Anchorage likewise argued that "indirect" would "eliminate the free lunch" and other forms of aid.[111] This debate suggests an understanding that the prohibition on direct benefits would not prohibit the provision of public welfare benefits to students enrolled in private schools.

In light of these debates, we stated in *Sheldon Jackson College v. State* that article VII, section 1 was "designed to commit Alaska to the pursuit of public, not private education, without requiring absolute governmental indifference to any student choosing to be educated outside the public school system."[112] The delegates "did not wish to prevent the state from providing for the health and welfare of private school

---

[108]   *See Wielechowski v. State*, 403 P.3d 1141, 1147 (Alaska 2017) (explaining that historical context prior to ratification helps to "define the constitution").

[109]   2 PACC 1514 (Jan. 9, 1956).  Moceri interprets this "contracting" language as an intent to permit school vouchers.  But context reveals that Delegate Armstrong used this language to refer to "health and matters of welfare."  *Id.*

[110]   *Id.* at 1517.

[111]   *Id.* at 1524.

[112]   599 P.2d 127, 129 (Alaska 1979).

students, or from focusing on the special needs of individual residents."[113] Applying these principles, we struck down a tuition grant program that "award[ed] Alaska residents attending private colleges in Alaska an amount generally equal to the difference between the tuition charged by the student's private college and the tuition charged by a public college in the same area."[114] We reasoned that the benefit was not "neutral" because only those attending private schools were beneficiaries; the benefit was not "incidental support" for students attending private colleges but rather a subsidy for their private school education; the magnitude of the benefit was "substantial"; and it was "direct" because the students were "merely a conduit" for the transmission of state funds to private colleges.[115]

Considering the text of article VII, section 1, the debates underlying its adoption, and our decision in *Sheldon Jackson*, we can confidently conclude that a substantial number of uses of allotment funds are constitutionally permissible. The parties all seem to agree that school districts can approve the purchase of books, computers, and art supplies from private businesses. And the constitutional convention delegates appeared to be in agreement that using public funds to purchase a homeschool curriculum from a private organization should be permitted.[116]

The parties also seem to agree that allotment funds can be spent on activities such as martial arts classes at a private gym or pottery lessons at an artist's studio. An artist's studio or a martial arts gym may be a "private organization." But absent some unusual facts, neither is akin to a school and therefore would not qualify as a "private educational institution" for purposes of the Alaska Constitution's prohibition on direct benefits. In addition, allotment funds can be spent to enroll in

---

[113] *Id.*

[114] *Id.* at 128.

[115] *Id.* at 128-32.

[116] *See* 2 PACC 1514, 1524-25 (Jan. 9, 1956).

classes at the University of Alaska, which is obviously an educational institution, but a public one.[117] None of these uses of allotment funds entails a "direct benefit" to a "religious or other private educational institution."

The superior court minimized the permissible uses of allotment funds, stating that "an occasional constitutional use" cannot save a "plainly unconstitutional statute." But the superior court did not explain why it found that constitutionally permissible uses of allotment funds like purchasing books, school supplies, art lessons, or martial arts classes are merely "occasional" uses. And we see no basis in the record for reaching that conclusion. In our view, the allotment statute plainly sweeps in a substantial number of constitutionally permissible uses of allotment funds.

> **b.** **Even if the Legislature intended to permit constitutionally suspect uses of allotment funds, that purpose would not negate or override the substantial number of constitutional uses of allotment funds.**

Despite the substantial number of constitutionally permissible uses of allotment funds, Alexander argues that both the allotment and ILP statutes are unconstitutional because the Legislature intended to allow allotment funds to pay private school tuition. The superior court agreed, concluding that the "express purpose" of the statutes was to allow families to purchase educational services from private schools. Even if true, this alleged purpose is not a proper basis to strike down the statutes in their entirety when they permit a substantial number of *other* uses of allotment funds that do not raise the same constitutional concerns.

---

[117] Alaska Const. art. VII, § 2 ("The University of Alaska is hereby established as the state university and constituted a body corporate.").

Courts use legislative history as a tool to decide what a statute means.[118] Legislative history can reveal what problems the legislature intended a statute to resolve or how a particular term should be defined.[119]  But legislative history usually does not override the plain terms of a statute.[120]

As explained above, the plain terms of the allotment statute permit a substantial number of uses of allotment funds besides paying tuition at private school, like purchasing books, computers, or athletic instruction.  There is no indication in the legislative history materials that the Legislature sought to *preclude* such uses.  Whatever the legislative history tells us about the Legislature's purpose in codifying and broadening the scope of the allotment program, it does not negate the numerous constitutional uses of allotment funds permitted by statute.

The same is true of the ILP statute.  It may be the case that the Legislature intended, in limiting the Department's oversight of ILPs, to impede the Department from preventing local school districts from allowing allotments to be used for private school tuition.  But reducing centralized control of local school districts is not inherently

---

[118]     *Se. Alaska Conservation Council, Inc. v. State, Dep't of Nat. Res.*, 470 P.3d 129, 141 (Alaska 2020) ("We interpret statutes . . . by 'look[ing] to three factors: the language of the statute, the legislative history, and the legislative purpose behind the statute.' ").

[119]     *See, e.g., Basey v. State, Dep't of Pub. Safety, Div. of Alaska State Troopers, Bureau of Investigations*, 462 P.3d 529, 537-39 (Alaska 2020) (relying on legislative history to determine that state employee disciplinary records are confidential "personnel records" under Alaska Public Records Act).

[120]     *See Alaska Pub. Def. Agency v. Superior Court*, 450 P.3d 246, 252 (Alaska 2019) ("[T]he plainer the language of the statute, the more convincing any contrary legislative history must be . . . to overcome the statute's plain meaning." (quoting *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Com.*, 414 P.3d 630, 634 (Alaska 2018))); *see also Hendricks-Pearce v. State, Dep't of Corr.*, 323 P.3d 30, 35-36 (Alaska 2014) ("Even if legislative history is somewhat contrary to the plain meaning of a statute, plain meaning still controls." (quoting *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 387 (Alaska 2013))).

unconstitutional. And Alexander has not suggested any constitutional problem with most of the ILP statute's provisions, which set forth how an ILP is created, how the student's progress should be monitored, and how the student's progress should be assessed.[121]

Therefore, the legislative history the superior court emphasized has little bearing on whether the allotment and ILP statutes are facially constitutional. If the statutes can be applied in a substantial number of constitutionally permissible ways, then a court should not prevent the people's will from being carried out within those constitutional bounds.

It is true that many of the uncontroversial uses of allotment funds were already authorized under the Department's correspondence and allotment regulations before the enactment of the allotment and ILP statutes.[122] The superior court was not wrong to perceive that the purpose of enacting these statutes was to authorize more flexibility for allotment funds, in terms of both uses and vendors.

But the expansion of allotment spending was not the only change made by these statutes, which also enshrined the ILP requirement and granted more autonomy to school districts.[123] These statutes superseded the existing regulations, which were subsequently repealed.[124] These statutes (and regulations enacted pursuant to them) thus became the primary framework for correspondence education and allotment spending. When the court ruled these statutes facially unconstitutional, it left school districts without a clear legal framework to offer correspondence study and left families

---

[121] AS 14.03.300(a).

[122] *See* former 4 AAC 33.421(h) (2014).

[123] AS 14.03.300(a)-(b).

[124] *See* former 4 AAC 33.421 (2014), *repealed* 4 AAC Register 213 (Mar. 6, 2015); *compare* former 4 AAC 33.421(g) (2014), *with* 4 AAC 33.421(h); *compare* former 4 AAC 33.421(d)(3) (2014), *with* former 4 AAC 33.421(a)(1) (2015), *amended* 4 AAC Register 218 (Apr. 6, 2016).

without the allotment funds to pay for supplies and services to pursue correspondence study. This broad ruling "prevent[ed] laws embodying the will of the people from being implemented" in many ways that did not violate the constitution.[125] That was not a proper remedy even if the legislative history evinced an intent to allow some kinds of spending the court deemed unconstitutional.

           **c.**        **Statutory limits on the Department's oversight of school district correspondence programs do not make the allotment and ILP statutes facially unconstitutional.**

In ruling the allotment and ILP statutes unconstitutional in their entirety, the superior court mentioned the portion of the ILP statute that limits the Department's oversight of allotment spending by local school districts. Alexander echoes this point on appeal, arguing that the court properly ruled both statutes facially unconstitutional because they "explicitly preclud[e] [the Department] from imposing any restrictions to keep expenditures within constitutional bounds." This argument refers to AS 14.03.300(b), under which the Department may not impose requirements on a correspondence student's ILP beyond those imposed by the district in which the student is enrolled unless the student fails to show proficiency on state assessments.[126]

Alexander interprets this provision to preclude the Department from restricting uses of allotment funds approved by local school districts. Because there is

---

      [125]    *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

      [126]    AS 14.03.300(b) ("Notwithstanding another provision of law, the department may not impose additional requirements, other than the requirements specified under (a) of this section and under AS 14.03.310, on a student who is proficient or advanced on statewide assessments required under AS 14.03.123(f).").

no State enforcement mechanism for unconstitutional spending, Alexander suggests, the statute lacks a plainly legitimate sweep.[127]  We are not persuaded by this argument.

The allotment statute's constitutionality does not depend on whether the State has an administrative mechanism preventing local school districts from unconstitutional spending.  School districts are governmental entities, bound by the constitution and subject to the jurisdiction of the courts.  School districts that authorize unconstitutional spending can be haled into court and made to stop.[128]  Even if the State had no way to prevent school districts from approving unconstitutional uses of allotment funds, that would not be a proper basis for the court to enjoin all valid uses of allotment funds, nor would it be a proper basis to enjoin the framework for local control of student instruction.

In conclusion, both the allotment statute and the ILP statute have a plainly legitimate sweep, and it was error to rule them facially unconstitutional.

B.    **We Decline To Decide Whether Using Allotment Funds To Pay Private School Tuition Is Constitutional.**

Both Alexander and Moceri argue that we should decide the narrower question of whether using allotment funds to pay students' tuition for full-time enrollment in private school is constitutional.  They argue that Moceri and the other parents' affidavits attesting to receipt of allotment funds for this purpose creates a

---

[127]    The statutes governing allotment spending and correspondence programs appear to give the Department some oversight role.  *See* AS 14.03.310(d)(3)-(4) (requiring department or district providing allotments to "maintain a record of expenditures and allotments" and "implement a routine monitoring of audits and expenditures"); AS 14.07.020(a)(9) (providing Department shall "exercise general supervision over elementary and secondary correspondence study programs offered by municipal school districts or regional educational attendance areas").  Precisely what powers the Department has remains disputed.  It is not necessary to resolve this dispute for purposes of this decision.

[128]    *See Breese v. Smith*, 501 P.2d 159, 175 (Alaska 1972) (concluding school board violated student's constitutional right to choose hairstyle).

sufficient factual basis in the record to permit us to rule on the constitutionality of the statutes as applied to these facts.

We decline this invitation. First, it is not clear the statutes authorize this practice, and the parties have not addressed that question in their briefing to us. Second, the school districts that have allegedly authorized this spending were not parties to this lawsuit.

### 1. The parties did not brief the question whether the allotment statute permits using allotment funds for private school tuition.

"To determine whether the challenged statute is constitutional we first interpret the statute."[129] But in this appeal the parties have not briefed a key threshold question: whether the allotment statute actually permits students enrolled in "correspondence study programs" to use allotment funds to pay private school tuition. The State argued to the superior court that the allotment statute does not permit spending allotment funds on full-time enrollment in private school.[130] Although the superior court's ruling appears to assume that the statute does permit allotment funds to be spent this way, the court did not squarely address the State's argument. And the court did not conduct any statutory analysis to determine whether that use was permitted under the ILP and allotment statutes. If the statute does not authorize spending

---

**129** *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019); *see State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001) (quoting *Kimoktoak v. State*, 584 P.2d 25, 31 (Alaska 1978) (noting "well-established rule of statutory construction" that courts should, if possible, construe statutes "to avoid the danger of unconstitutionality")).

**130** For example, the State has adopted a regulatory definition of "correspondence study program" that means "any educational program . . . that provides . . . for each secondary course, less than three hours per week of scheduled face-to-face interaction, in the same location, between a teacher certificated under AS 14.20.020 and each class" and, "for elementary students, less than 15 hours per week of scheduled face-to-face interaction, in the same location, between a teacher certificated under AS 14.20.020 and each full-time equivalent elementary student." 4 AAC 33.490(17); 4 AAC 09.990(a)(3).

allotment funds on enrollment in private school, then there would be no reason to decide whether that use of public funds is unconstitutional.[131]  Consequently, we do not decide whether using allotment funds for private school tuition complies with article VII, section 1.

> **2.      We cannot rule whether use of allotment funds for private school tuition violates the constitution when no school district that has authorized such spending was a party to the litigation.**

The superior court concluded that Alexander's as-applied constitutional challenge could proceed without joining school districts because the Department "is the state agency with the ultimate responsibility to ensure public funds are used in accordance with the Alaska Constitution."  The Department argues that this ruling was error because school districts were necessary parties and the Department cannot be held liable for their conduct.  Alexander responds that the school districts are not necessary parties because the Department has general supervisory authority over the school districts and the Attorney General has "the authority to ensure compliance with Alaska's Constitution."  The State has the better argument.  We will not decide an as-applied constitutional challenge when the entity that took the allegedly unconstitutional action is not a party to the lawsuit.

Our procedural rules require a party to be joined to a lawsuit if "complete relief" cannot be awarded without it.[132]  Alexander sought both declaratory and injunctive relief.  Although Alaska courts have authority to issue declaratory judgments, they may do so only when there is an "actual controversy" between the parties,[133] which

---

[131]      *Planned Parenthood of the Great Nw.*, 436 P.3d at 992 ("If an ambiguous statute is susceptible to more than one reasonable interpretation, of which only one is constitutional, the doctrine of constitutional avoidance directs us to adopt the interpretation that saves the statute.").

[132]      Alaska R. Civ. P. 19(a).

[133]      AS 22.10.020(g); *Jefferson v. Asplund*, 458 P.2d 995, 998-99 (Alaska 1969).

means "that the conduct of one party adversely affects the interest of another."[134] Similarly, injunctive relief is an extraordinary equitable remedy that will not be granted if the relief directly impacts the rights of a party not represented in the lawsuit.[135]

In this case complete relief cannot be afforded until a school district that has actually authorized the spending Alexander claims is unconstitutional is joined to the lawsuit. Although the State has general supervisory authority over school districts' correspondence programs,[136] it is the school districts that approve students' ILPs and authorize particular uses of allotment funds.[137] For this reason, Alexander's claim that certain uses of allotment funds are unconstitutional is not an "actual controversy" permitting declaratory judgment unless he sues a school district that has authorized those uses of allotment funds.[138] And if no school district is party to the litigation, there is no party whose actions the court can properly enjoin.

---

[134] *Keen v. Ruddy*, 784 P.2d 653, 656 (Alaska 1989) (citing *Bowers Off. Prods. v. Univ. of Alaska*, 755 P.2d 1095, 1097 (Alaska 1988)).

[135] *See Lee v. Konrad*, 337 P.3d 510, 517 (Alaska 2014); *see* 43A C.J.S. *Injunctions* § 322 (2024) ("Generally, all persons who are materially interested in the outcome of a suit for an injunction . . . or who will be affected by the decree, should be made parties.").

[136] *See, e.g.*, 4 AAC 33.420, .440, .460(a)-(c); AS 14.07.020(a)(1), (2), (4), (9); AS 14.07.030(a)(14).

[137] AS 14.03.300(a); AS 14.03.310(a). If the Department operated its own correspondence study program, it too would be in the position of authorizing specific uses of allotment funds. But the record indicates it does not operate its own correspondence program.

[138] *See* Alaska R. Civ. P. 19(a) ("A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . complete relief cannot be accorded among those already parties . . . .").

We therefore vacate the court's denial of the State's motion to dismiss Alexander's as-applied challenge and remand for further proceedings.[139] It is up to Alexander to decide which particular uses of allotments he believes are unconstitutional and to join a school district that has authorized that spending.[140]

## V. CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the superior court and REMAND for further proceedings.

---

[139] Because the constitutionality of using allotment funds for private school tuition is not properly before us, we do not address Moceri's argument that the federal constitution *requires* the State, when making public funds available to pay for correspondence study, to pay for a student's tuition at a private or religious school.

[140] Our decision is not meant to determine whether the State itself is a necessary party to an as-applied challenge to AS 14.03.300–.310.